67 F.3d 377
 64 USLW 2198
 PRO-CHOICE NETWORK OF WESTERN NEW YORK, Buffalo GYN Women
Services, Erie Medical Center, Paul J. Davis,
M.D., Shalom Press, M.D., Barnett
Slepian, M.D., Plaintiffs-Appellees,
v.
Rev. Paul SCHENCK, Dwight Saunders, Defendants-Appellants,
Project Rescue Western New York, Operation Rescue, James L.
Evans, Rev., Ted Cadwallader, Rev., David Anderson, Jeffrey
Baran, Brian Bayley, Bonnie Behn, Ronald Breymeier, Gilbert
Certo, Scott Chadsey, Kim Day, Constance Debo, Mark Dent,
Wayne Dent, Paul Diemert, Joan Giangreco, Delores Glaser,
Carmelina Golba, Kevin Golba, Linda Hall, Nancy Hall, Thomas
Hall, Daniel Hamlin, Rev., James Handyside, Pamela
Huffnagle, Donna Johanns, Eric Johns, Neal Kochis, Paulette
Likoudis, Charles McGuire, Christopher Morrow, Annemarie
Nice, Nicholas Pukalo, Carla Rainero, Thomas Riley, Patricia
Ostrander, Linda Ross, David Smith, Mark Sterlace, Joyce
Strigel, John Thomann, John Tomasello, Paul Waldmiller, Jr.,
Nancy Walker, Leonard Winter, Horace Wolcott, John Does,
Jane Doe, the last two names being fictitious names, the
real names of said defendants being presently unknown to
plaintiffs, said fictitious names being intended to
designate organizations or persons who are members of
defendant organizations and others acting in concert with
any of the defendants who are engaging in, or intend to
engage in the conduct complained herein, Project Life of
Rochester, Gerald Crawford, David Long, Defendants.
 No. 1215.
Docket 92-7302.
 United States Court of Appeals,
Second Circuit.
 Argued March 24, 1994.
Decided Sept. 6, 1994.
Argued in banc April 17, 1995.
Decided Sept. 28, 1995.
 
 Vincent P. McCarthy, New Milford, CT (Joseph P. Secola, McCarthy & Secola, New Milford, CT; Jay Alan Sekulow, James M. Henderson, Sr., Walter M. Weber, Byron J. Babione, American Center for Law & Justice, Washington, DC, of counsel), for Defendants-Appellants.
 Lucinda M. Finley, Buffalo, NY (Glenn Murray, of counsel), for Plaintiffs-Appellees.
 Deval L. Patrick, Assistant Attorney General, Washington, DC; David K. Flynn, Samuel R. Bagenstos, of counsel, for the United States as Amicus Curiae.
 Michael P. Tierney, New York City, for Legal Center for Defense of Life as Amicus Curiae.
 Martha F. Davis, Yolanda S. Wu, Deborah A. Ellis, New York City, for NOW Legal Defense and Education Fund, American Medical Women's Association, B'nai B'rith Women, Catholics for a Free Choice, Center for Reproductive Law and Policy, Connecticut Women's Education and Legal Fund, Inc., Feminist Majority Foundation, Lambda Legal Defense and Education Fund, National Abortion Federation, National Center for Lesbian Rights, National Women's Law Center, Northwest Women's Law Center, National Organization for Women, Women's Law Center, Women's Law Project, Women's Legal Defense Fund, and YWCA of the U.S.A. as Amici Curiae.
 Dennis C. Vacco, Attorney General of the State of New York, New York City; Victoria A. Graffeo, Solicitor General, Robert A. Forte, Assistant Attorney General, of counsel, for State of New York as Amicus Curiae.
 Steven R. Shapiro, Janet Gallagher, Louise Melling, Karen Laiter, New York City, for American Civil Liberties Union Foundation as Amicus Curiae.
 Arthur N. Eisenberg, Donna Lieberman, Yueh-ru Chu, New York City, for New York Civil Liberties Union Foundation as Amicus Curiae.
 Before NEWMAN, Chief Judge, OAKES, MESKILL, KEARSE, WINTER, MINER, ALTIMARI, MAHONEY, WALKER, McLAUGHLIN, JACOBS, LEVAL, CALABRESI, CABRANES, and PARKER, Circuit Judges.
 
 
 1
 OAKES, Senior Circuit Judge, with whom Chief Judge NEWMAN and Circuit Judges KEARSE, MINER, WALKER, LEVAL, CALABRESI, CABRANES, and PARKER join:
 
 
 2
 This appeal was reheard in banc to reconsider the constitutionality of two provisions of an injunction issued against abortion clinic protesters. One provision creates fifteen-foot buffer zones around abortion clinic entrances, driveways, vehicles entering clinic driveways, and patients entering or leaving the clinics; two "sidewalk counselors" are allowed in the buffer zones to "counsel" patients as they approach or leave the clinics. The second provision requires that if a patient expresses a desire to be left alone, the counselors must "cease and desist" and retreat to outside the buffer zone. The issue arises on an appeal by anti-abortion protesters from an order of the United States District Court for the Western District of New York, Richard J. Arcara, Judge, issuing the injunction. We hold that inclusion of the two provisions in the injunction was proper, as they burden no more speech than necessary to further significant government interests. We therefore vacate the portion of the panel opinion striking down these provisions, and we affirm these two provisions as modified.
 
 Background
 
 3
 Plaintiffs-Appellees Buffalo GYN Womenservices, P.C., Erie Medical Center, Paul J. Davis, M.D., Shalom Press, M.D., Barnett Slepian, M.D., Morris Wortman, M.D., Highland Obstetrical Group, and Alexander Women's Group are health care providers located in Western New York that offer family planning and gynecological services, including abortion services, at their health care facilities. Plaintiff-Appellee Pro-Choice Network of Western New York is a not-for-profit corporation based in Buffalo, New York. Its primary goal is to maintain legal and safe access to family planning and abortion services in the Western New York area.
 
 
 4
 While the Defendants were comprised of the organizations Project Rescue Western New York, Operation Rescue and Project Life of Rochester, and fifty individuals who oppose abortion and have engaged in demonstrations at or near abortion clinics in Western New York, the only Appellants are the individuals Rev. Paul Schenck and Dwight Saunders.
 
 I. The Lawsuit
 
 5
 This case commenced on September 24, 1990, when the Plaintiffs (collectively "Pro-Choice Network") filed suit against the Defendants (collectively "Project Rescue") asserting seven causes of action. The first alleges that the defendants are engaged in a conspiracy to deprive women seeking abortions of the privileges and immunities of national citizenship and the equal protection of the laws in violation of 42 U.S.C. Sec. 1985(3). The remaining six causes of action assert claims based on New York State law. They are: (1) violation of N.Y. Civil Rights Law Sec. 40-c and N.Y. Executive Law Sec. 296; (2) tortious interference with business; (3) trespass; (4) intentional infliction of emotional harm; (5) tortious harassment; and (6) false imprisonment.
 
 
 6
 Along with the complaint, Pro-Choice Network filed a motion for a temporary restraining order (TRO) pursuant to Fed.R.Civ.P. 65(b) to enjoin a "blockade" the defendants had announced for September 28, 1990. After a hearing, the district court issued a TRO enjoining defendants from "blockading" the plaintiffs' medical facilities and from harassing the patients and staff entering or exiting those facilities.[1] On September 28, 1990, the defendants complied with the TRO by holding a peaceful protest rather than a blockade.
 
 
 7
 Pro-Choice Network moved to have the TRO converted into a preliminary injunction. With the consent of the parties, the district court ordered that the TRO would remain in effect until the motion for a preliminary injunction was decided. While the motion was pending, Pro-Choice Network filed civil contempt motions against six individual defendants and against Project Rescue, alleging violations of the TRO on six separate occasions (though hearings on only five of these were held prior to the issuance of the preliminary injunction).
 
 II. The District Court Opinion
 
 8
 From March 6, 1991, to April 1, 1991, the district court held a hearing on the preliminary injunction motion. The court also held hearings on the civil contempt motions intermittently from February 6, 1991, through January 30, 1992.
 
 A. Factual Findings
 
 9
 As a result of the evidence taken at those hearings, the district court, in an opinion and order issued February 14, 1992, made extensive findings of fact, as summarized below.
 
 
 10
 Project Rescue organizes and participates in "rescue" demonstrations at clinics throughout Western New York, including medical facilities associated with Plaintiffs-Appellees. Through these demonstrations, Project Rescue intends to prevent abortions, dissuade women from seeking abortion services, and impress upon the public the morality of its "pro-life" views. The demonstrations are mostly peaceful in nature, but they often become emotionally charged encounters between demonstrators, patients and patient escorts.
 
 
 11
 Project Rescue has stipulated that a physical "blockade," which prevents patients and staff from entering or exiting a medical facility, may be enjoined. Thus, only two demonstration methods used by Project Rescue are at issue in this case: (1) constructive "blockades," in which demonstrators protest and picket in a loud and disruptive manner outside the medical facilities and harass patients and staff entering and exiting the facilities; and (2) "sidewalk counseling" of patients entering the facilities.
 
 
 12
 The constructive blockades have the same goal as the physical blockades--preventing utilization of the clinics. Instead of physically blocking patient access to the clinics, Project Rescue constructively blockades the clinics by forcing patients and staff to run a gauntlet of harassment and intimidation.
 
 
 13
 At times, demonstrators yell at patients, patient escorts and medical staff entering and leaving the health care facilities. The demonstrators also crowd around people trying to enter the facilities in an intimidating and obstructing manner, and grab, push and shove the patients, patient escorts and staff.
 
 
 14
 Pro-Choice Network of Western New York v. Project Rescue Western New York, 799 F.Supp. 1417, 1424 (W.D.N.Y.1992) (Pro-Choice I ). This harassment and intimidation causes stress and sometimes even physical injury to the patients and medical staff, and generally disrupts the atmosphere necessary for rendering safe and efficacious health care.
 
 
 15
 In implementing the constructive blockades, Project Rescue also targets vehicles entering the driveways of the medical facilities:
 
 
 16
 Demonstrators frequently and routinely congregate in or near the driveway entrances to the facility parking lots in order to impede and obstruct access to the facilities. The presence of numerous demonstrators in the driveway entrances intimidates and impedes the drivers of cars seeking access to the parking lots of the facilities and creates a danger to both the occupants of the cars and the demonstrators themselves. The demonstrators also make loud and disruptive noises and chant persistently.
 
 
 17
 Id.
 
 
 18
 These activities, on some occasions, have so intimidated and confused patients approaching the clinics that they have left the areas, causing them to suffer a delay in obtaining medical care. This delay can increase the risks associated with an abortion:
 
 
 19
 For example, the delay may move the pregnancy from the first trimester to the second trimester during which the risks associated with the procedure increase. Other women who are seeking a post-abortion check-up might delay their appointment or simply cancel it altogether, thereby enhancing the possibility of complications. For some women who elect to undergo an abortion, clinic medical personnel prescribe and insert a device known as a pre-abortion laminaria to achieve cervical dilation. In these instances, timely removal of the laminaria is necessary to avoid infection, bleeding and other potentially serious complications. If a woman returning to have the laminaria removed finds that her access to the clinic entrance is blocked or impeded ... the above-mentioned complications may result.
 
 
 20
 Id. at 1427. In some instances, as when the women come from a distance, they cannot easily reschedule their appointments once they have been deterred by Project Rescue from obtaining an abortion on the scheduled day.
 
 
 21
 In addition to constructively blockading the medical facilities, Project Rescue engages in a form of advocacy known as "sidewalk counseling." Demonstrators approach patients entering the clinics, offer them anti-abortion literature, and try to convince them not to have an abortion. While Project Rescue contends that this sidewalk counseling is done in a peaceful manner, the demonstrators often become angry and frustrated when patients persist in entering the clinics:
 
 
 22
 The "counselors" then turn to harassing, badgering, intimidating and yelling at the patients and patient escorts in order to dissuade them from entering. They continue to do so even after the patients signal their desire to be left alone. The "sidewalk counselors" often crowd around patients, invade their personal space and raise their voices to a loud and disturbing level.
 
 
 23
 Id. at 1425. Many of the sidewalk counselors have been arrested on more than one occasion for harassment, yet persist in harassing and intimidating patients, patient escorts and medical staff.
 
 
 24
 The patients who have been the target of Project Rescue's "sidewalk counseling" and other "rescue" efforts usually enter the medical facilities shaken and severely distressed:
 
 
 25
 Several of the plaintiff health care providers testified that, for most women, the decision to undergo an abortion is already difficult and stressful. Plaintiffs presented uncontradicted testimony that the risks associated with an abortion increase if the patient suffers from additional stress and anxiety. Increased stress and anxiety can cause patients to: (1) have elevated blood pressure; (2) hyperventilate; (3) require sedation; or (4) require special counseling and attention before they are able to obtain health care. Patients may become so agitated that they are unable to lie still in the operating room thereby increasing the risks associated with surgery.
 
 
 26
 Id. at 1427. In addition, the patients are often too agitated to undergo medical procedures, and thus must postpone their appointments--although they may well again encounter the demonstrators upon their return. In such cases, the delay in treatment may increase the risks associated with the medical procedures as discussed above.
 
 
 27
 Finally, "[l]ocal law enforcement has been unable to respond effectively to plaintiffs' complaints about 'pro-life' demonstrators harassing patients and blocking access to the clinics." Id. at 1426. The protests occur continually, and the local police do not have the resources to monitor the situation constantly. A number of protesters have been prosecuted under local laws, but have not been deterred from repeatedly engaging in their illegal pattern of activity.
 
 B. The Injunction
 
 28
 Based on these facts, the district court found that Project Rescue's activities threatened to continue into the future, and unless enjoined would cause clinic patients irreparable harm, including increased medical risks and the denial of constitutionally protected rights. The court found that injunctive relief was required to prevent that harm.
 
 
 29
 The court also found that Pro-Choice Network had demonstrated a likelihood of success on the merits of its Sec. 1985(3) claim, based both on the right to travel and the right of women to choose to have an abortion. It found as well that, having demonstrated a likelihood of success on its claim under Sec. 1985(3), Pro-Choice Network had, by definition, demonstrated a likelihood of success on its claim under New York Civil Rights Law Sec. 40-c. It also found that Pro-Choice Network had demonstrated a likelihood of success on its state trespass claim. As the court decided that these claims provided sufficient grounds for the injunction, it did not address whether an injunction should issue based on Pro-Choice Network's other state law claims.
 
 
 30
 On February 14, 1992, the court issued the injunction now at issue in this appeal. (The injunction is reproduced as an Appendix to this opinion.) Paragraph 1(a) of the injunction enjoins Project Rescue from trespassing on, sitting in, blocking, impeding, or obstructing access to the entrances, including the parking lot entrances and driveways, of any medical facility that performs abortions in the Western District of New York.
 
 
 31
 Paragraph 1(b) creates fifteen-foot buffer zones around the entrances to those medical facilities, their driveways and driveway and parking lot entrances, and around any person or vehicle seeking access to or leaving the facilities. The provision prohibits Project Rescue from demonstrating within the buffer zones except that two sidewalk counselors may enter, as provided in Paragraph 1(c).
 
 
 32
 Paragraph 1(c) enjoins Project Rescue from physically abusing, grabbing, touching, pushing, shoving, or crowding any people entering or leaving the medical facilities. It also provides, however, that the demonstrators are free to participate in "sidewalk counseling," which the section defines as a conversation of a non-threatening nature by not more than two people. The section further provides that if a person or group of people does not want to be counseled, or wants to leave or walk away, the counselors must "cease and desist" from counseling, and shall then be governed by the provisions of Paragraph 1(b) that prohibit demonstration within the fifteen-foot zone.
 
 
 33
 Paragraph 1(d) prohibits Project Rescue from using mechanical loudspeakers or sound amplification devices or making any excessively loud sounds which endanger the health of the patients at the medical facilities. Paragraph 1(e) prohibits Project Rescue from aiding or abetting others in acting in violation of other sections of the injunction. Paragraph 2 provides for penalties of $10,000 and up per day for violations of the injunction.
 
 
 34
 The district court carefully reviewed the terms of the injunction to ensure that the provisions did not violate Project Rescue's First Amendment rights. As the court's decision was issued before the Supreme Court's recent opinion in Madsen v. Women's Health Center, Inc., --- U.S. ----, 114 S.Ct. 2516, 129 L.Ed.2d 593 reh'g denied, --- U.S. ----, 115 S.Ct. 23, 129 L.Ed.2d 922 (1994), the court applied the then-controlling law on restrictions of time, place, and manner of expression, namely that the restrictions must be (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication of information. Pro-Choice I, 799 F.Supp. at 1432 (citing Frisby v. Schultz, 487 U.S. 474, 481, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988); Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). The court found that the injunction met all three requirements.
 
 III. The Appeal
 
 35
 Two individual defendants, Paul Schenck and Dwight Saunders, appealed, pursuant to 28 U.S.C. Sec. 1292(a)(1), from the district court's order issuing the preliminary injunction. While the appeal was pending, the Supreme Court decided Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). The Court held that a Sec. 1985(3) claim, which requires a showing of some invidious, class-based animus and an interference with rights that are protected against private interference, could not be sustained against anti-abortion activists because an opposition to abortion does not reflect an animus toward women in general, and because anti-abortion activists do not conspire with the goal of interfering with interstate commerce.
 
 
 36
 Soon after Bray was issued, Project Rescue moved in district court to dismiss the complaint and vacate the injunction. It argued that Pro-Choice Network's Sec. 1985(3) claim should be dismissed pursuant to Bray, and that, after the federal claim was dismissed, the pendent state claims should be dismissed as well. The appeal from the issuance of the injunction was dismissed by stipulation of the parties, without prejudice to reinstatement by any party within twenty days of the district court's resolution of Project Rescue's motion.
 
 
 37
 Upon consideration of the motion, the district court dismissed the Sec. 1985(3) claim, with leave for Pro-Choice Network to amend its complaint to bring the Sec. 1985(3) claim within the holding of Bray. Pro-Choice Network of Western New York v. Project Rescue Western New York, 828 F.Supp. 1018, 1027 (W.D.N.Y.1993) (Pro-Choice II ). The court further held that, even without the Sec. 1985(3) claim, it was "compelled, under notions of judicial economy, convenience, fairness and comity, to continue to exercise jurisdiction over the remaining state-law claims." Id. Thus, the court denied Project Rescue's motion to vacate the preliminary injunction.
 
 
 38
 Project Rescue appealed from the district court's refusal to vacate the injunction, and the appeal from the issuance of the injunction was reinstated. A panel of this court heard these consolidated appeals on March 24, 1994, and on September 6, 1994, a divided panel issued an opinion affirming the district court's denial of the motion to vacate and upholding all parts of the injunction with the exception of the fifteen-foot buffer zone and the "cease and desist" provision. Judge Oakes dissented from the portion of the opinion striking down the two provisions. Pro-Choice Network of Western New York v. Project Rescue Western New York, 67 F.3d 359 (2d Cir.1994) (Pro-Choice ).[2]
 
 
 39
 Appellees petitioned this court for a rehearing in banc. On December 27, 1994, we ordered a rehearing "limited to the issues of whether the District Court erred in including in the injunction the provision concerning a fifteen-foot buffer zone and the 'cease and desist' provision." Pro-Choice, No. 92-7302 (2d Cir. December 27, 1994).
 
 Discussion
 
 40
 The sole issues before us on in banc rehearing are whether the district court erred in including in the injunction (1) the 15-foot buffer zone provision and (2) the "cease and desist" provision. In considering these questions, we do not consider whether these provisions continue to be supportable under Pro-Choice Network's remaining state law claims following the dismissal of its section 1985(3) claim; as the Pro-Choice panel found, slip op. at 6992-94, --- F.3d at ---- - ----, the district court has not yet had occasion to consider these issues. The issue before us, rather, is solely whether the two contested provisions impermissibly infringe Project Rescue's First Amendment right to freedom of speech.[3]
 
 
 41
 The threshold issue is whether the injunction, taken as a whole, is content-based and accordingly subject to strict scrutiny, or content-neutral--that is, justified "without reference to the content of the regulated speech," Madsen, --- U.S. at ----, 114 S.Ct. at 2523 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 reh'g denied, 492 U.S. 937, 110 S.Ct. 23, 106 L.Ed.2d 636 (1989)); R.A.V. v. City of St. Paul, 505 U.S. 377, ----, ----, 112 S.Ct. 2538, 2542, 2544, 120 L.Ed.2d 305 (1992)--and thus subject to less rigorous examination. In light of the Supreme Court's recent opinion in Madsen, examining a similar injunction and finding it content-neutral, it is clear that the injunction as a whole is not content-based. In Madsen, the Court concluded that the fact that an injunction "restricts only the speech of antiabortion protestors" does not mean that it is content-directed:
 
 
 42
 That petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order. It suggests only that those in the group whose conduct violated the court's order happen to share the same opinion regarding abortions being performed at the clinic.
 
 
 43
 Madsen, --- U.S. at ---- - ----, 114 S.Ct. at 2523-24. In the instant case, as in Madsen, the injunction's purpose is both content- and viewpoint-neutral: the court imposed restrictions on the demonstrators not to suppress their anti-abortion message but "incidental to their antiabortion message because they repeatedly violated the court's original order." Id. at ----, 114 S.Ct. at 2524. The injunction was imposed on Project Rescue to prevent the irreparable harm that prospective patients would suffer if Project Rescue's "rescue" activities continued to impede access to abortion services. Pro-Choice I, 799 F.Supp. at 1428.
 
 
 44
 Since the injunction's purpose is content-neutral, we apply the test set out in Madsen to the contested provisions: whether they "burden no more speech than necessary to serve a significant government interest." --- U.S. at ----, 114 S.Ct. at 2525. As the Court explained, this test, while not amounting to the strict scrutiny that we have applied to content-based restrictions of speech, is more rigorous than the test that has traditionally been applied to content-neutral regulations of the time, place, and manner of expression. See, e.g., Rock Against Racism, 491 U.S. at 791, 109 S.Ct. at 2753 (determining whether the regulations were "narrowly tailored to serve a significant governmental interest") (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). We apply more rigorous scrutiny to an injunction which restricts expression than to legislation which does so, the Court reasoned, because "[i]njunctions ... carry greater risks of censorship and discriminatory application than do general ordinances." --- U.S. at ----, 114 S.Ct. at 2524.
 
 
 45
 In applying the Madsen test, we first examine whether the government interests identified by the district court are significant. The district court identified three interests served by the injunction, which closely parallel the three interests identified by the Court in Madsen. First, it noted, the government "has a legitimate interest in seeing to it that an abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient." Pro-Choice I, 799 F.Supp. at 1433 (quoting Roe v. Wade, 410 U.S. 113, 150, 93 S.Ct. 705, 725, 35 L.Ed.2d 147 (1973)); see also Madsen, --- U.S. at ----, 114 S.Ct. at 2526 (finding significant the government's interest in protecting the psychological and physical well-being of abortion patients). Second, the injunction "effectuates the significant governmental interest of public safety" in that it prohibits defendants from blocking traffic entering and leaving the clinics and from pushing or crowding persons as they enter or leave. Pro-Choice I, 799 F.Supp. at 1433; accord Madsen, --- U.S. at ----, 114 S.Ct. at 2526. Finally, by protecting plaintiffs' rights to travel and to have an abortion, the injunction "serves the significant governmental interest of ensuring 'that the constitutional rights of one group are not sacrificed in the interest of the constitutional rights of another.' " Pro-Choice I, 799 F.Supp. at 1433 (quoting New York State NOW v. Terry, 886 F.2d 1339, 1364 (2d Cir.1989)); accord Madsen, --- U.S. at ----, 114 S.Ct. at 2526 (protecting "a woman's freedom to seek lawful medical or counseling services"). We agree, as the Supreme Court did in Madsen, --- U.S. at ----, 114 S.Ct. at 2526, that these governmental interests--medical safety, public safety, and access to abortions--are entirely sufficient to justify an appropriately tailored injunction to protect them. Accordingly, we turn to each of the contested provisions of the injunction "to see if it burdens more speech than necessary to accomplish its goal." Id.
 
 I. The Buffer Zone
 
 46
 Paragraph 1(b) of the preliminary injunction (the "buffer zone provision") establishes a fifteen-foot buffer zone around the entrances to all facilities in the Western District of New York at which abortions are performed. The provision enjoins defendants, as well as their agents and representatives "and all other persons ... acting in their behalf or in concert with them," from
 
 
 47
 demonstrating within fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances of such facilities, or within fifteen feet of any person or vehicle seeking access to or leaving such facilities, except that the form of demonstrating known as sidewalk counseling by no more than two persons ... shall be allowed[.]
 
 
 48
 "Sidewalk counseling," as described in paragraph 1(c), consists of "a conversation of a non-threatening nature by not more than two people with each person or group of persons they are seeking to counsel."
 
 
 49
 In short, this provision establishes what might be deemed a permeable buffer zone with a "floating" fifteen foot radius: demonstrators must remain at least fifteen feet away from each entrance to an abortion facility, the entrance to its parking area and its driveways, and from women, doctors, and other staff at the facility seeking access to or leaving the facility, with the exception that two "counselors" are allowed to enter the buffer zone to engage in "non-threatening conversation" with each person or group of persons approaching or leaving the facility.
 
 
 50
 Project Rescue contends that the buffer zone provision fails the Madsen test in that it "burdens more speech than necessary" to accomplish its purposes. In particular, it contends, the buffer zone is not necessary to effectuate the goal of securing unfettered access to the clinics because paragraph 1(a) of the injunction, which prohibits Project Rescue from impeding or obstructing access to the clinics, already accomplishes that task.
 
 
 51
 In evaluating whether the fifteen-foot buffer zone is more burdensome than necessary, we note that the Supreme Court in Madsen found a thirty-six-foot buffer zone necessary to protect the government interests enumerated in that case. --- U.S. at ----, 114 S.Ct. at 2527. The thirty-six-foot buffer zone in Madsen was in some ways broader and in some ways narrower than the zone in this case. The Madsen zone was narrower in that, while it extended thirty-six feet from clinic entrances, it did not, as in this case, "float" so as to protect persons approaching or leaving the clinic. On the other hand, the Madsen zone was broader than the zone before us in two significant ways. First, it extended a more substantial distance--thirty-six feet from the clinic entrances. Second, within that thirty-six-foot zone, the ban it imposed on speech was absolute: it admitted no "sidewalk counselors" or any other form of advocacy within the zone.
 
 
 52
 The Madsen trial court imposed its arguably more restrictive buffer zone on the basis of a record comparable to that considered by the district court in this case. Compare Madsen, --- U.S. at ---- - ----, 114 S.Ct. at 2521-22, with Pro-Choice I, 799 F.Supp. at 1423-27. As in this case, the Madsen trial court found that the protesters picketed and demonstrated in a way that impeded and blocked public access to the clinics. Also as in this case, it "found that as vehicles heading toward the clinic slowed to allow the protesters to move out of the way, 'sidewalk counselors' would approach and attempt to give the vehicle's occupants antiabortion literature." Madsen, --- U.S. at ----, 114 S.Ct. at 2521. The Madsen court also found that, as in this case, the protests "took their toll on the clinic's patients." Id. A clinic doctor testified--just as doctors did in this case--that the anxiety suffered by patients after having to "run such a gauntlet" to enter the clinics increased the risks associated with the abortion procedures. Id. Finally, as with the TRO in this case, the trial court found that despite an initial injunction, protesters continued to impede access to the clinics. Id.
 
 
 53
 We are not convinced by the dissent's recitation of distinctions between the record in the instant case and in Madsen. See dissent at 400-401, 403 (noting that this case, unlike Madsen, "does not ... involve a full-fledged 'blockade,' " that the pickets were "peaceful" and for the most part complied with the TRO, and that "the bulk of the testimony given at the preliminary injunction hearing pertained to events taking place prior to the district court's granting of the TRO").
 
 
 54
 First, it is uncontested that this case was filed in response to Project Rescue's announcement that it would conduct a blockade on September 28, 1990; the blockade failed to take place only because the district court issued its TRO enjoining the blockade on the day before it was scheduled to occur. Second, although the district court did note that the "rescue" demonstrations "are usually peaceful in nature," 799 F.Supp. at 1423, it also described at great length the "emotionally charged encounters" that ensue as demonstrators "yell at patients" and "crowd around people trying to enter the facilities in an intimidating and obstructing manner, and grab, push and shove the patients, patient escorts and staff," id. at 1423-24; and see supra, at 401-403 (describing demonstrators' harassment and intimidation of patients and the harmful effect of this behavior).
 
 
 55
 Finally, we find unpersuasive the dissent's reminder that Project Rescue demonstrators generally complied with the TRO (with some notable exceptions), and that, in issuing the preliminary injunction, the district court thus relied to a large degree on obstructionist activities which had ceased after the TRO was in place. It goes without saying, of course, that district courts routinely issue preliminary injunctions on the basis of activities which, following a TRO, have already ceased. See, e.g., ICN Pharmaceuticals, Inc. v. Khan, 2 F.3d 484, 486-88 (2d Cir.1993). It is also self-evident that the terms of a preliminary injunction need not be confined to those of an earlier TRO, if the evidentiary hearing--whether concerning pre- or post-TRO activity--makes clear that broader protections are warranted; a TRO is a provisional remedy imposed to maintain the status quo until a full review of the facts and legal arguments is available, see Warner Bros., Inc. v. Dae Rim Trading, Inc., 877 F.2d 1120, 1124-25 (2d Cir.1989). Lastly, nothing in Madsen states, or even implies, that a TRO must fail before a broader injunction may be imposed; the Madsen Court simply noted that the failure of an initial injunction to accomplish its purpose is one factor which "may be taken into consideration" in evaluating the constitutionality of a subsequent, broader order. --- U.S. at ----, 114 S.Ct. at 2527.
 
 
 56
 In this case, the district court found the buffer zones necessary to effectuate both the goal of ensuring access to the clinics as well as the goal of ensuring the safe performance of abortions. Project Rescue's argument that the buffer zones are not "necessary" because Paragraph 1(a) is sufficient to prevent obstruction of clinic entrances ignores the fact that the zones also further the significant government interest of ensuring medical safety, an interest recognized by the Madsen Court. --- U.S. at ----, 114 S.Ct. at 2526. The district court explained:
 
 
 57
 In crafting the injunction, the Court has been guided by the paramount need to maintain an atmosphere conducive to the health care functions of plaintiffs' facilities. As the Supreme Court has advised, in evaluating the need for and legitimacy of restrictions on expressive activity, courts must keep in mind the normal functions of the location in question and whether the nature of the demonstration activity is conducive to or disruptive of normal activities. Here, in the context of health care facilities treating women who are already undergoing the stress normally associated with having an abortion, there is an attendant need for a calm, quiet, stress-free atmosphere. Defendants' noisy, disruptive, invasive, threatening and intimidating activities are clearly inappropriate in such a setting. The significant governmental interest inherent in providing safe medical care to the public justifies certain carefully drawn restrictions on defendants' expressive activities.
 
 
 58
 Pro-Choice I, 799 F.Supp. at 1433-34 (citation omitted).
 
 
 59
 We find the district court's reasoning persuasive. In light of the extensive record documenting Project Rescue's harassment and intimidation of patients, and documenting the effects produced by such harassment, see id. at 1427, we cannot find the fifteen-foot buffer zone broader than necessary to protect patients' health and well-being. The buffer zones are quite specifically tailored to effectuate the goals of the injunction. The protesters are prohibited from demonstrating en masse only within a very short radius--fifteen feet--of clinic entrances, parking lot entrances, driveways, and persons or vehicles "seeking access to or leaving" the clinics.[4] Project Rescue can still picket, carry signs, pray, sing or chant in full view of people going into the clinic or just passing by. Within the fifteen-foot buffer, "sidewalk counselors" can engage in individualized, face-to-face communication with persons entering the clinics in an effort to persuade such persons, on a personal level, that abortion is wrong. This provision ensures that the injunction does not hamper Project Rescue's message, only its intimidating method of demonstration.
 
 
 60
 Project Rescue contends nevertheless that, even if we find that concerns for medical safety justify a buffer zone around patients approaching the clinics, these concerns do not justify the injunction's broad protection of patients "seeking access to or leaving" the clinics. We disagree. We are not convinced that persons leaving a clinic are any less in need of a buffer zone than those approaching a clinic. A person leaving a clinic may just have received an abortion and may consequently be in a medically vulnerable state. Alternatively, she may have visited the clinic for a preliminary appointment prior to scheduling an abortion, and the prospect of "running the gauntlet" again may deter her from returning. As the district court found, delay--whether of the abortion itself or of a post-abortion check-up--can substantially increase the risks associated with an abortion. See id.
 
 
 61
 In sum, we find the buffer zones fully justified by the record before us. As the Supreme Court has noted, "some deference must be given to the [trial] court's familiarity with the facts and the background of the dispute between the parties even under our heightened review." Madsen, --- U.S. at ----, 114 S.Ct. at 2527. Although the district court issued the injunction without benefit of the Supreme Court's analysis in Madsen, we are fully able to apply the Madsen standard to the record below. We conclude that the fifteen-foot buffer zones burden no more speech than necessary to accomplish the governmental interests at stake in this case.
 
 II. The "Cease and Desist" Provision
 
 62
 We next examine whether the "cease and desist" provision "burden[s] no more speech than necessary to serve a significant government interest," Madsen, --- U.S. at ----, 114 S.Ct. at 2525. This provision confers on women seeking access to abortion facilities the right to refuse counseling at an intimate range within the buffer zone:
 
 
 63
 [N]o one is required to accept or listen to sidewalk counseling, and ... if anyone or any group of persons who is sought to be counseled wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event all persons seeking to counsel that person or group of persons shall cease and desist from such counseling, and shall thereafter be governed by the provisions of paragraph (b) pertaining to not demonstrating within fifteen feet of persons seeking access to or leaving a facility.
 
 
 64
 Preliminary Injunction p 1(c).
 
 
 65
 As with the buffer zone provision, we begin with Madsen. Project Rescue contends that we should strike down this provision because the Madsen Court struck down a similar provision which, although more restrictive, "operated identically in principle and effect." Appellants' Br. at 24. As discussed below, we do not find Madsen dispositive of this issue.
 
 
 66
 The Madsen Court struck down a provision which ordered demonstrators not to approach any person within 300 feet of the clinic who is seeking the clinic's services "unless such person indicates a desire to communicate." Madsen, --- U.S. at ----, 114 S.Ct. at 2529 (internal quotes omitted). The Court disposed of this provision in summary fashion, finding that, absent evidence of threats of violence, the provision violated the general maxim that "in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." Id. (quoting Boos v. Barry, 485 U.S. 312, 322, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988)) (internal quotes omitted). The Court concluded:
 
 
 67
 [I]t is difficult, indeed, to justify a prohibition on all uninvited approaches of persons seeking the services of the clinic, regardless of how peaceful the contact may be, without burdening more speech than necessary to prevent intimidation and to ensure access to the clinic.
 
 
 68
 Id. (emphasis in original).
 
 
 69
 The categorical "no-uninvited-approach" order of the Madsen trial court is significantly different from the "cease and desist" provision before us. That order gave no opportunity to anti-abortion counselors to proffer their advice at an intimate range unless the counselees "indicate[d] a desire to communicate by approaching or by inquiring of the [counselors]." Madsen, --- U.S. at ----, 114 S.Ct. at 2522. They were obliged to remain on the opposite side of the street. Id. at ----, 114 S.Ct. at 2526. Even a woman who was willing to receive such counseling could not receive it unless she affirmatively sought it out. This order, in contrast, permits two counselors, acting in a non-threatening manner, to approach for counseling unless the recipient affirmatively refuses to receive such counseling at an intimate range. Thus the "cease and desist" provision is far more solicitous of the demonstrators' interest in approaching their target audience face-to-face and delivering their message. They may approach without being invited and need not retreat unless expressly rejected by a counselee, and then only to a distance of fifteen feet.
 
 
 70
 Project Rescue contends that the "cease and desist" requirement is impermissibly vague or overbroad in several respects. First, Project Rescue notes, the injunction fails to spell out expressly what kind of indication or behavior by prospective "counselees" triggers the requirement that a "counselor" "cease and desist." Paragraph 1(c) states that "if anyone ... wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event all persons seeking to counsel that person or group of persons shall cease and desist from such counseling." As Project Rescue notes, the meaning of "in such event" is less than entirely clear: while the reference to a person's "leav[ing]" or "walk[ing] away" is unproblematic, it appears that the "cease and desist" requirement is also triggered by the person's "want[ing] to not have counseling" and "do[ing] that"--a construction that, Project Rescue contends, fails to put "counselors" on proper notice as to when they must leave the buffer zone.
 
 
 71
 Any vagueness in the provision, however, has already been remedied by the district court. In its February 14, 1992 opinion, the court decided that the "cease and desist" provision will only be enforced if the targeted person or group "indicates, either verbally or non-verbally, that they do not wish to be counseled...." Pro-Choice I, 799 F.Supp. at 1434. This interpretation, we think, accords a common sense meaning to the provision and makes clear at what point counseling must cease. Accordingly, we direct the district court on remand to so modify the language of the injunction.
 
 
 72
 Project Rescue contends, secondly, that the meaning of "cease and desist from such counseling" is unclear. The provision, it contends, may be interpreted to require a rebuffed "counselor" to stop communicating entirely with the woman who has rebuffed the "counselor's" message--a requirement that, it contends, would constitute an unnecessarily broad restriction of defendants' expressive activities. We do not read the provision as Project Rescue urges. "Such counseling," the injunction makes clear, refers to the practice of "sidewalk counseling" described in the preceding sentence: namely, the right of one or two demonstrators to enter the fifteen-foot buffer zone around a prospective patient in order to engage her in "conversation of a non-threatening nature." To "cease and desist from such counseling," accordingly, means to back off from a prospective "counseling" target so that that person is accorded the full protection of the fifteen-foot buffer zone. Once outside this zone, the "counselor," as we see it, may continue advocating his or her beliefs to the woman who has refused them, albeit now from a distance of fifteen feet. The "counselor" remains free as well, of course, to approach anyone else to attempt to "counsel" them, or to hand out leaflets to passersby, or to demonstrate as she sees fit within the bounds of the injunction.[5]
 
 
 73
 Thus interpreted, the provision that the parties have dubbed "cease and desist" may more accurately be deemed the "walk away" provision. The purpose of this provision is not, as Project Rescue asserts, to suppress speech because of the anxiety its content produces in its audience, see Boos v. Barry, 485 U.S. 312, 322, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988), but rather to provide a vulnerable group of medical patients with some relief from the duress caused by unwelcome physical proximity to an extremely vocal group of demonstrators. Cf. International Soc'y for Krishna Consciousness v. Lee, 505 U.S. 672, ----, 112 S.Ct. 2701, 2708, 120 L.Ed.2d 541 (1992) (applying "reasonableness" standard appropriate to government limitations of speech in nonpublic fora). This purpose is content-neutral, as it is the demonstrators' physical proximity which is regulated rather than their message.
 
 
 74
 The district court clearly found that, absent this provision, women seeking access to the clinics were "captive" to Project Rescue's invasive conduct and unable to "walk away":
 
 
 75
 Defendants surround the facilities and force women seeking access to them to run a gauntlet of demonstrators, picketers and "sidewalk counselors." The evidence adduced at the hearings clearly shows that, even when women seeking access to the clinics signal their desire to be left alone, defendants continue to follow right alongside them and persist in communicating their message. It is obvious, therefore, that women seeking access to plaintiffs' facilities cannot, as a practical matter, escape defendants' message. Defendants' aggressive conduct makes it impossible for women entering the clinics simply to avert their eyes or cover their ears in order to avoid receiving defendants' message. The only choice women have if they want to avoid the message is to forego their constitutional right to have an abortion. Thus, women entering plaintiffs' clinics are a "captive audience" for defendants' message and the "cease and desist" provision of the injunction is warranted.
 
 
 76
 Pro-Choice I, 799 F.Supp. at 1436.
 
 
 77
 The courts have recognized the rights of "captive audiences" to be free not only of unwanted speech occurring outside traditional public fora, see Krishna Consciousness, 505 U.S. at ---- - ----, 112 S.Ct. at 2708-09 (upholding ban on disruptive solicitation of funds in public airport); Young v. New York City Transit Auth., 903 F.2d 146, 158 (2d Cir.) (upholding ban on subway panhandling out of concern that public transportation be "reasonably safe, propitious and benign"), cert. denied, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990); see also Lehman v. City of Shaker Heights, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (plurality opinion) (upholding ban on political advertising on public transportation), but even in traditional fora, in which First Amendment rights are at their zenith, when circumstances indicate a heightened need to protect the right of the listener to be left alone, the courts have done so. See Frisby v. Schultz, 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (upholding ban on residential sidewalk picketing given government interest in protecting captive listener's right to privacy in his home). In Madsen, the Court acknowledged that an abortion clinic, with the medical risks attendant thereto, presents such circumstances. "[W]hile targeted picketing of the home threatens the psychological well-being of the 'captive' resident," the Court noted, "targeted picketing of a hospital or clinic threatens not only the psychological, but the physical well-being of the patient held 'captive' by medical circumstance." --- U.S. at ----, 114 S.Ct. at 2526.
 
 
 78
 The "cease and desist" provision, the district court found, was necessary to protect not only the right of access to abortions but, in effect, the "physical well-being" of women seeking such access and held " 'captive' by medical circumstance." On the record before us, we cannot conclude that this finding was erroneous. As a panel of this court has noted in upholding a similar injunction restraining a clinic "rescue" operation, "[i]nsofar as appellants' rights of free speech were exercised in close proximity to individual women entering or leaving the clinics so as to tortiously assault or harass them, appellants' rights ended where those women's rights began." New York State NOW v. Terry, 886 F.2d 1339, 1343 (2d Cir.1989).[6] We agree, and we conclude that the "cease and desist" provision passes the Madsen test in that it "burden[s] [no] more speech than necessary to accomplish its goal."
 
 Conclusion
 
 79
 For the reasons set forth above, we conclude that both the buffer zone provision and the "cease and desist" provision are constitutional. Accordingly, we vacate the portion of the panel opinion striking down these provisions, and we affirm these provisions as modified. The remainder of the district court's order, which is not before this in banc court, remains affirmed by the panel's opinion.
 
 APPENDIX
 PRELIMINARY INJUNCTION
 
 80
 Upon consideration of the evidence introduced at a hearing held on plaintiffs' motion for a preliminary injunction, and at hearings on plaintiffs' motions to find defendants Nancy Walker, Bonnie Behn, Carla Rainero, Rev. Paul Schenck, Rev. Robert Schenck and Project Rescue in civil contempt for violations of this Court's Temporary Restraining Order, and upon consideration of the complaint and supporting documents, and upon consideration of defendants' stipulations pertaining to the entry of a preliminary injunction against certain conduct and to the binding nature of any preliminary injunction on all named individual and organizational defendants, it is hereby
 
 
 81
 ORDERED that defendants, the officers, directors, agents, and representatives of defendants, and all other persons whomsoever, known or unknown, acting in their behalf or in concert with them, and receiving actual or constructive notice of this Order, are:
 
 
 82
 1. Enjoined and restrained in any manner or by any means from:
 
 
 83
 (a) trespassing on, sitting in, blocking, impeding, or obstructing access to, ingress into or egress from any facility, including, but not limited to, the parking lots, parking lot entrances, driveways, and driveway entrances, at which abortions are performed in the Western District of New York;
 
 
 84
 (b) demonstrating within fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances of such facilities, or within fifteen feet of any person or vehicle seeking access to or leaving such facilities, except that the form of demonstrating known as sidewalk counseling by no more than two persons as specified in paragraph (c) shall be allowed;
 
 
 85
 (c) physically abusing, grabbing, touching, pushing, shoving, or crowding persons entering or leaving, working at or using any services at any facility at which abortions are performed; provided, however, that sidewalk counseling consisting of a conversation of a non-threatening nature by not more than two people with each person or group of persons they are seeking to counsel shall not be prohibited. Also provided that no one is required to accept or listen to sidewalk counseling, and that if anyone or any group of persons who is sought to be counseled wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event all persons seeking to counsel that person or group of persons shall cease and desist from such counseling, and shall thereafter be governed by the provisions of paragraph (b) pertaining to not demonstrating within fifteen feet of persons seeking access to or leaving a facility. In addition, it is further provided that this right to sidewalk counseling as defined herein shall not limit the right of the Police Department to maintain public order or such reasonably necessary rules and regulations as they decide are necessary at each particular demonstration site;
 
 
 86
 (d) using any mechanical loudspeaker or sound amplification device or making any excessively loud sound which injures, disturbs, or endangers the health or safety of any patient or employee of a health care facility at which abortions are performed, nor shall any person make such sounds which interfere with the rights of anyone not in violation of this Order;
 
 
 87
 (e) attempting, or inducing, directing, aiding, or abetting in any manner, others to take any of the actions described in paragraphs (a) through (d) above; and it is further
 
 
 88
 ORDERED that nothing in this Order shall be construed to limit defendants and those acting in concert with them from exercising their legitimate First Amendment rights; and it is further
 
 
 89
 ORDERED that the defendant organizations and their officers and agents, and all individual defendants and those acting in concert with them, shall make a good faith effort to instruct all organizations and individuals they believe to be planning to participate in any of the activities enumerated above not to engage or participate in the activities enjoined in paragraphs (a) through (e) above;
 
 
 90
 2. IT IS FURTHER ORDERED that the failure to comply with this Order by any defendant or anyone acting in their behalf or in concert with them shall be subject to civil damages of $10,000 per day for the first violation of this Order and/or may subject them to criminal contempt proceedings; and it is further
 
 
 91
 ORDERED that each successive violation of this Order shall subject the contemnor to a civil contempt fine double that of the previous fine and/or criminal contempt proceedings; and it is further
 
 
 92
 ORDERED that any amounts collected thereunder shall be paid to the Plaintiff health care facility at which the violation occurred, or to the Registry of the Court if the targeted health care facility is not a Plaintiff; and it is further
 
 
 93
 ORDERED that each contemnor shall be jointly and severally liable for all attorney's fees and related costs incurred by plaintiffs in relation to the enforcement of this Order.
 
 
 94
 3. Violations of this Order shall be enforced by appropriate motion.
 
 
 95
 4. IT IS FURTHER ORDERED that the United States Marshal for the Western District of New York shall read this Order as set forth above in Paragraphs 1 and 2 in their entirety at the site of a demonstration or protest at a facility at which abortions are performed in the Western District of New York. Plaintiffs' counsel shall be responsible for notifying the Marshal in a timely manner of the location of such demonstration or protest activity.
 
 
 96
 5. It is the Court's intention that nothing contained in this Order shall supersede or diminish the obligation of local and state law enforcement authorities to fulfill their duties and responsibilities in enforcing state laws and local ordinances.
 
 
 97
 6. This Order shall remain in full force and effect until modified by further Order, or until final resolution by this Court of the claims for permanent injunctive relief in the above captioned matter.
 
 
 98
 It is so ordered.
 
 
 99
 WINTER, Circuit Judge, with whom NEWMAN, Chief Judge, KEARSE, MAHONEY, McLAUGHLIN, JACOBS, WALKER, LEVAL, CALABRESI, and CABRANES, Circuit Judges, join, concurring in the result:
 
 
 100
 I concur in the result. I write separately because I believe that Judge Oakes's opinion is an application of a somewhat broader principle than it acknowledges, namely that the First Amendment does not, in any context, protect coercive or obstructionist conduct that intimidates or physically prevents individuals from going about ordinary affairs.
 
 
 101
 Where advocacy is involved, the core notion of the First Amendment is the familiar marketplace of ideas. Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). The goal is to keep channels of communication free of governmentally imposed impediments so that individuals who want to persuade their fellow citizens to adopt a particular belief or to alter intended conduct will have an opportunity to do so. Kovacs v. Cooper, 336 U.S. 77, 87, 69 S.Ct. 448, 453, 93 L.Ed. 513 (1949) (plurality opinion).
 
 
 102
 The notion of a marketplace of ideas gives primacy to the right to persuade largely for two reasons. First, we justifiably fear that those who govern will be relentlessly tempted to censor their critics. It is difficult to conceive of a working democracy that does not in some way protect those seeking to speak to voters in the hope of unseating those in power. See New York Times Co. v. Sullivan, 376 U.S. 254, 276, 84 S.Ct. 710, 724, 11 L.Ed.2d 686 (1964) ("broad consensus" that restraint upon criticism of government and public officials is "inconsistent with the First Amendment"); Mills v. Alabama, 384 U.S. 214, 218-19, 86 S.Ct. 1434, 1436-37, 16 L.Ed.2d 484 (1966) ("major purpose" of the First Amendment is to protect free discussion of governmental affairs). Second, we want citizens to have exposure to competing ideas in the faith that truth and humane values will have the best chance of prevailing under such a system. See Cohen v. California, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971); Whitney v. California, 274 U.S. 357, 375-76, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). This is, as stated, a matter of faith and not empirically testable. It may also be easy to quarrel with intellectually, until one is asked to fashion a workable, alternative system for the real world. Where advocacy is concerned, therefore, the First Amendment is concerned with persuasion.
 
 
 103
 However, the goal of freeing advocacy from governmental control has important, sometimes overriding, implications for audiences as well as speakers. Rowan v. United States Post Office Dep't, 397 U.S. 728, 736, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736 (1970) ("[T]he right of every person 'to be let alone' must be placed in the scales with the right of others to communicate."). A legal rule implementing a market-place of ideas protects advocates in the interests of the audience. Pacific Gas & Elec. Co. v. Public Utils. Comm'n, 475 U.S. 1, 8, 106 S.Ct. 903, 907, 89 L.Ed.2d 1 (1986) ("By protecting those who wish to enter the marketplace of ideas ..., the First Amendment protects the public's interest in receiving information.") (plurality opinion). It inexorably requires that individuals who are subject to advocacy be left free to make up their own minds and to adhere to their convictions or intended courses of conduct should they remain unpersuaded. Advocates have a right to a full opportunity to appeal to reason, interest, policy, or morals, but they have no right to seek to alter the mind or conduct of the audience by coercion or obstruction. See Rowan, 397 U.S. at 738, 90 S.Ct. at 1491 ("[N]o one has a right to press even 'good' ideas on an unwilling recipient."); Kovacs, 336 U.S. at 86-87, 69 S.Ct. at 453 (A visitor cannot "insert a foot in the door and insist on a hearing," and a passer-by may be "offered a pamphlet in the street but cannot be made to take it."); Schneider v. State, 308 U.S. 147, 162, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939) (acknowledging right to distribute literature "to one willing to receive it"); cf. International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, ----, 112 S.Ct. 2701, 2708, 120 L.Ed.2d 541 (1992) ("risk[ ] of duress" presents an "appropriate target of regulation"). Those who seek to do more than peacefully persuade individuals, therefore, are themselves acting in a way quite inconsistent with a marketplace of ideas.
 
 
 104
 We thus need not tolerate coercive or obstructionist conduct solely because it serves some passionate ideology or interest. The First Amendment protects peaceful communication, not self-indulgence. Nor need we tolerate such conduct because it makes the advocate feel good. The First Amendment is not a governmental version of the psychiatrist's couch.
 
 
 105
 In determining whether conduct is coercive or obstructionist, some leeway or legal "breathing space" should be allowed to the advocate so that censorship is not disguised as the keeping of order. See Boos v. Barry, 485 U.S. 312, 322, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988); Cohen, 403 U.S. at 26, 91 S.Ct. at 1788. For example, shame is a form of persuasion often expressed in epithets indicating immorality or selfishness that may be regarded by a substantial segment of the public as insulting. However, insults that contain neither threats of coercion that intimidate nor fighting words that create the possibility of imminent violence, see Chaplinsky v. New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942), must be tolerated. Polarizing debates lead to strong language, and an attempt to impose rules of etiquette would inhibit the debate by forcing speakers to weigh every word and empower government with far too much discretion to define permissible and impermissible modes of advocacy.
 
 
 106
 The leeway afforded advocates is the greatest where the audience is the general public or is a voluntary rather than involuntary participant. See Madsen v. Women's Health Center, Inc., --- U.S. ----, ----, 114 S.Ct. 2516, 2527, 129 L.Ed.2d 593 (1994); Frisby v. Schultz, 487 U.S. 474, 484-85, 486, 108 S.Ct. 2495, 2502-03, 2503, 101 L.Ed.2d 420 (1988). The general public is a diffuse body that is not easily coerced by words or non-violent symbolic acts. Where more than fleeting exposure to the advocacy is avoidable, moreover, the chance of coercion is low.
 
 
 107
 However, where specific individuals are targeted at locations difficult or inconvenient for them to avoid, the First Amendment's tolerance of plausibly coercive or obstructionist protest is least, precisely because the temptation and opportunity for coercion or obstruction are at their greatest. See, e.g., Frisby, 487 U.S. at 486, 108 S.Ct. at 2503 (affording lesser protection for "targeted picketing" that "inherently and offensively intrudes on residential privacy"). The law need not blind itself to the fact that targeted protest is often directed at individuals who have already given considerable thought to the subject at hand, do not agree with the protestor, and are quite unlikely to be moved by peaceful persuasion. In such circumstances, the protestor may become frustrated, refuse to take "no" for an answer, and be tempted to go beyond persuasion in seeking to change the target's views or conduct.
 
 
 108
 Generally, targeted persons, whether they be customers of a business, residents of a particular house, workers at a firm, the trustees of a university, military recruiters, delegates at a political convention, or patients and employees of an abortion clinic, are not voluntarily exposed to the protests. Rather, they have been sought out at a particular location that they can avoid only at a cost, see, e.g., Krishna Consciousness, 505 U.S. at ----, 112 S.Ct. at 2708 (upholding restrictions on expression at an airport in part because travelers are often weighted down by baggage, in a hurry, and some "cannot easily avoid ... solicitation"), and the opportunity to bring direct coercive or obstructive pressure on the individuals is great, see Madsen, --- U.S. at ----, 114 S.Ct. at 2528 ("The First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests."). Moreover, the power of televised pictures of coercive or obstructionist conduct to chill others is considerable and an independent reason motivating some protestors to go beyond peaceful persuasion. For example, one may be legitimately skeptical about whether residential picketing is designed to persuade anyone by the strength of the argument presented. See, e.g., Frisby, 487 U.S. at 486, 108 S.Ct. at 2503 ("[P]icketing ... narrowly directed at [a] household ... do[es] not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way."). Rather, it seeks to compel the homeowner to buy peace by abandoning convictions and to warn those who might share the homeowner's convictions to alter their views or suffer the same fate.
 
 
 109
 In my view, therefore, there is no right to invade the personal space of individuals going about lawful business, to dog their footsteps or chase them down a street, to scream or gesticulate in their faces, or to do anything else that cannot be fairly described as an attempt at peaceful persuasion. Moreover, an extensive record of coercion or obstruction is not required to justify an injunction requiring physical separation and an end to such conduct. The power of even isolated threats or obstructions to exert a chilling effect on some members of society need not be ignored. The timid have a right to go about their business, and it is no embarrassment for a federal court to say so.
 
 
 110
 My emphasis on protecting targets of protest from coercive or obstructionist conduct should not be mistaken for a failure to acknowledge that the state has other interests in preventing such behavior. In Madsen, for example, the Court noted the state's "strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks, and in protecting the property rights of all its citizens." --- U.S. at ----, 114 S.Ct. at 2526. Society has a strong interest in permitting businesses, universities, and medical clinics to operate, in protecting commerce and the flow of traffic, and in allowing individuals to have privacy in their residences and otherwise to use their property. These are important interests and are frequently invoked to justify restraints on protestors. However, I believe it worth emphasizing that coercion or obstruction does not gain First Amendment protection simply because no one is physically injured, traffic moves, and private property is not invaded. A placid scene that is the result of citizens not going where they wish to be in order to avoid bullying is hardly consistent with a marketplace of ideas.
 
 
 111
 I would also note that my views are not an application of doctrines concerning public or non-public fora, see Krishna Consciousness, 505 U.S. at ----, 112 S.Ct. at 2705; Hague v. CIO, 307 U.S. 496, 515-16, 59 S.Ct. 954, 963-64, 83 L.Ed. 1423 (1939) (Roberts, J.), or captive audiences, see Frisby, 487 U.S. at 484-85, 108 S.Ct. at 2502-03; Public Utils. Comm'n v. Pollak, 343 U.S. 451, 468, 72 S.Ct. 813, 823, 96 L.Ed. 1068 (1952) (Douglas, J., dissenting), although those doctrines inform some of the distinctions discussed above. Those doctrines define circumstances in which government may restrict speech that is otherwise protected. My point is that coercive or obstructionist conduct is not protected by the First Amendment in any forum and regardless of the nature of the audience. As noted, the legal breathing space afforded the protestor in defining coercion or obstruction may vary according to the forum and ability of the audience to avoid the protest at little cost. However, actual coercion or obstruction is not protected speech at any time or in any place.
 
 
 112
 Turning to the present case, affirmance of the district court is dictated generally by this principle. The protests here were not directed at the general public. The targets were particular individuals who either worked at, or were patients of, the abortion clinic. The location was selected precisely because the targets had to choose either to pass by the protestors or to quit work or forgo services at the clinic. There was, moreover, under either the view of the panel majority or panel dissent, a considerable amount of obstruction and bullying by both the protestors and the self-described counselors. It appears undisputed that a physical blockade of the clinic was planned and was forestalled only by the issuance of a temporary restraining order. Pro-Choice Network v. Project Rescue, 799 F.Supp. at 1424. Moreover, numerous coercive and obstructionist acts occurred before the order issued. The protestors "crowd[ed] around people trying to enter the facilities in an intimidating and obstructing manner, and grab[bed], push[ed] and shov[ed] the patients, patient escorts and staff ..." Id. The self-described counselors would become "angry and frustrated" when persons showed indifference to their proffers and would "then turn to harassing, badgering, intimidating and yelling at the patients and patient escorts...." Id. at 1425. The counselors would "often crowd around patients, invade their personal space and raise their voices to a loud and disturbing level." Id. After issuance of the restraining order, at least two further acts of obstruction occurred.
 
 
 113
 In Madsen, the Supreme Court approved an injunction barring anti-abortion protestors from entering a 36-foot zone around the entrances to an abortion clinic. --- U.S. at ----, 114 S.Ct. at 2527. The majority of the panel that originally decided this appeal believed that the record in Madsen revealed a considerably greater history of disruption than does the record in the instant matter. Pro-Choice Network v. Schenck, 67 F.3d 359, 371 (2d Cir.1994). I agree. However, the 15-foot buffer zone is not a significant infringement upon speech and does not require an extensive record of bullying to be justified. A nose-to-nose confrontation is hardly essential to the conveying of the protestors' views and will, given their history of intimidation, be reasonably perceived by those seeking to enter the clinic as intimidating.
 
 
 114
 I also see no constitutional violation in the cease and desist order directed at the counselors. They distinguish their role from that of protestors by claiming that they seek only to provide patients with information relating to the availability of alternative services, etc. However, some of the counselors in the instant matter have in the past resorted to bullying as soon as their proffer of advice was rebuffed, and I see no First Amendment barrier to a requirement that, once the would-be counselors have had an opportunity to offer advice and it is declined, they must respect the buffer area applicable to protestors.
 
 
 115
 Moreover, the court is unanimous in the view that some form of injunction was justified, and Judge Arcara's order was an entirely reasonable response to the events that occurred. Indeed, an order that commands a specific physical separation but does not prevent communication in an ordinary tone of voice gives certainty to the advocate as to what is lawful and thus avoids the risk of a contempt adjudication for violating a vague order not to interfere with entry or exit. One irony of the appellants' position in this court is that they attack the specific portions of the order as unconstitutionally rigid and the more general portions of the order as impermissibly vague.[1]
 
 
 116
 I thus concur in the result.
 
 
 117
 JACOBS, Circuit Judge, with whom MAHONEY, Circuit Judge, joins, concurring in the result:
 
 
 118
 I join fully in Judge Winter's opinion. I write separately to frame my concern that Judge Oakes' opinion invokes a set of governmental interests so narrowly drawn as to be message specific.
 
 
 119
 Judge Oakes' opinion repeatedly describes the governmental interests at stake in terms of vulnerable and agitated patients seeking a potentially dangerous medical procedure in the tranquil precincts of a clinic. Since the only other governmental interest emphasized by Judge Oakes' opinion is the interest in preserving abortion rights, the Appellants are to be forgiven if they suspect that the opinion and rationale can have no realistic application other than the regulation of anti-abortion protest.
 
 
 120
 Of course, the rationale for any injunction affecting speech will take account of specific circumstances and the conduct of the individuals whose expression is affected. The governmental interests invoked to justify a restraint on protests, however, should not be so narrow that they squelch only one side of a single controversy.
 
 
 121
 I vote to uphold the injunction for the reasons stated in Judge Winter's opinion, and because I think the result is required by Madsen. The rationale adopted in Madsen, however, was not message specific. Although the Madsen Court did identify "governmental interests" in "protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy," and in the "physical well-being of the patient held 'captive' by medical circumstance," Madsen, --- U.S. at ----, 114 S.Ct. at 2526, the Court also invoked broader state interests in public safety and the right to travel that transcend the abortion controversy: "The State also has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks, and in protecting the property rights of all its citizens." Id.
 
 
 122
 If the governmental interests justifying the Pro-Choice injunction were as narrow as Judge Oakes' opinion describes (the protection of the health and rights of women seeking medical attention at an abortion clinic), the injunction would be much too broad, for it casts a bubble over pedestrians and car passengers regardless of whether a womanlet alone a patient--is among them. In their brief, the Appellants iterate that the injunction insulates "clinic patrons and staff," "prospective patients and staff members," and that none of the witnesses claiming to have suffered stress or other injury "was even a clinic patient." (Emphasis added.) Thus the Appellants argue that the bubble-zone cease and desist provisions are "content-based censorship to the extent they are justified because of alleged stress or mental reaction of, or emotive impact on, the [clinic's] customers and staff." (Emphasis added.)
 
 
 123
 The bubbles in Madsen, which excluded protestors from the areas adjacent to the clinic's entrances, thereby insulated the clinic's clientele as well as other persons entering and leaving the clinic, such as the clinic accountant, nurses and doctors, and friends of the patients. No distinction between patients and other persons would have been feasible in Madsen if access for patients was to be secured. This lack of differentiation becomes a problem in Pro-Choice, however, because the floating bubble is in the nature of personal armor. Yet the injunction does not limit this protection of personal space to women seeking abortion services, or to groups that include such a woman, or even to a groups of pedestrians or automobile passengers that include at least one woman. Rather, a bubble is cast over every "person or vehicle seeking access to or leaving" the clinic. Paragraph 1(b). Thus the injunction protects the private space of every male staff member walking alone to the clinic.
 
 
 124
 Such an injunction cannot be justified solely by a governmental interest in preserving the health (and medical choices) of patients at abortion clinics. Ultimately, the justification for this injunction rests on the government interests set forth in Judge Winter's opinion, and the broad interests identified in Madsen, --- U.S. at ----, 114 S.Ct. at 2526 (public safety, the free flow of traffic on public sidewalks and property rights of all citizens).
 
 
 125
 MESKILL, Circuit Judge, dissenting (with whom Judge ALTIMARI concurs):
 
 
 126
 Today thirteen of this Court's judges give approval to an injunction that seriously infringes on the constitutional rights of freedom of speech and expression. The reasons for this judgment are stated in two separate opinions, expressing two separate rationales. I refer to the two opinions as the Judge Oakes opinion and the Judge Winter opinion rather than calling either the majority opinion because each has garnered the support of more than half of the members of the in banc court. In my view, neither opinion provides an adequate foundation for the Court's ultimate decision. I therefore dissent.
 
 
 127
 A careful examination of the entire record in this case should lead to one conclusion: the inclusion of both the buffer zone and the cease and desist provisions in the injunction fails the analysis enunciated in Madsen v. Women's Health Center, --- U.S. ----, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). Indeed, as I read the record, what was done by appellants--the picketing, the leafletting, the voicing of protest--was done in the finest tradition of the First Amendment, hardly justifying so sweeping an abridgement of free speech. Regrettably, the majority today concludes otherwise, embarking this Court on an ill-fated journey whose destination is the dilution of the public forum doctrine, the very core of the First Amendment. To such a result I cannot agree.
 
 
 128
 * Permeating Judge Oakes' analysis is the belief that we should simply defer to the district court's decision, relying on its familiarity with the facts and background of this dispute. In fashioning its injunction, however, the district court proceeded under the "reasonable time, place, and manner" standard. See, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). Subsequently, the Supreme Court decided Madsen, holding that the evaluation of injunctions restricting speech required a "more stringent application of general First Amendment principles." See --- U.S. at ----, 114 S.Ct. at 2524. In an attempt to convince the reader that the injunction crafted under the more lenient "time, place, and manner" standard also satisfies the more "rigorous," id., Madsen standard, Judge Oakes' opinion ignores much of the record and misstates some of what it does not ignore.
 
 
 129
 Judge Oakes' opinion properly acknowledges that the Madsen standard is the appropriate starting point for our analysis of the injunction in this case. Consequently, the opinion purports to apply Madsen 's standard for evaluating the constitutionality of content neutral injunctions restricting expressive conduct in a traditional public forum: "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." Id. at ----, 114 S.Ct. at 2525. Indeed, Judge Oakes peppers his opinion with references to the Madsen test, citing to it no fewer than ten times. See, e.g., Oakes op. at Discussion I ("We conclude that the fifteen-foot buffer zones burden no more speech than necessary to accomplish the governmental interests at stake in this case."); Oakes op. at Discussion II ("We agree, and we conclude that the 'cease and desist' provision passes the Madsen test in that it 'burden[s] [no] more speech than necessary to accomplish its goal.' "). Yet, remarkably, the analysis fails to adhere to Madsen even once, as evidenced by the opinion's ultimate approval of two provisions of an injunction that clearly ban significantly more speech than necessary to achieve the injunction's legitimate goals.
 
 A. The Buffer Zone
 
 130
 One who reads the Oakes opinion must wonder how any disagreement (let alone a dissent) could exist among members of this Court regarding the so-called buffer zone, given that the opinion leaves the unmistakable impression that the facts of this case are so similar to those in Madsen. See, e.g., Oakes op. at Discussion I ("The Madsen trial court imposed its arguably more restrictive buffer zone on the basis of a record comparable to that considered by the district court in this case."). This impression is no accident; indeed, it is purposefully created. For without this mischaracterization the opinion simply could not fit this case into the Madsen rule.
 
 
 131
 In Madsen, despite an earlier injunction prohibiting the protestors from blocking access to the clinic, crowds of up to 400 people stood, knelt and sat in the public street leading up to the clinic and in the clinic's entryways, thereby physically preventing potential patients from entering the clinic and slowing the flow of vehicular traffic. See Operation Rescue v. Women's Health Center, 626 So.2d 664, 667 (Fla.1993), aff'd in part, rev'd in part, Madsen v. Women's Health Center, --- U.S. ----, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). As patients' cars approached the clinic driveways, moreover, the throngs swarmed the vehicles, "running along side of and in front of [them], pushing pamphlets in car windows." Operation Rescue, 626 So.2d at 678 (quoting injunction). The demonstrations at times required the presence of nearly fifty police officers to control the crowds, to ensure the flow of traffic, and to permit patients to enter the clinics. Additionally, the trial court found the demonstrations infused with violence, cataloging the incidents of unlawful acts in its opinion. For instance, threats were made to clinic staff, patients and employees--"[o]n [one] occasion [a clinic] doctor was followed as he left the clinic by a person ... who communicated his anger to the doctor by pretending to shoot him from the adjoining vehicle." Id. Phone lines were jammed, making it impossible for the clinic to summon emergency aid. The court further noted that stalking of patients and staff was a tactic regularly employed by the demonstrators. In short, the clinic in Madsen was subject to the type of "rescue" demonstration activity more aptly described as a "blockade." See Pro-Choice Network of Western N.Y. v. Project Rescue Western N.Y., 799 F.Supp. 1417, 1424 (W.D.N.Y.1992) (explaining that "blockade" is a large-scale demonstration where demonstrators "sit or lay in the entrances of the clinic in an attempt to block access to and egress from the clinic").
 
 
 132
 This appeal also involves demonstrations outside abortion clinics. Unlike Madsen, however, our case does not, as the district court specifically found, involve a full-fledged "blockade." See id. at 1424 n. 5 ("Commendably, there have been no physical 'blockades' since the Court issued the [temporary restraining order]."). Rather, on the public sidewalks in front of family planning clinics in the Western District of New York, a group of five to forty activists distributed literature about abortion and abortion alternatives, engaged in "sidewalk counseling" in an effort to inform and educate, picketed, carried signs, sang, participated in prayer vigils, chanted and shouted anti-abortion slogans. The record, moreover, is clear: the protestors obeyed, not disobeyed, the district court's temporary restraining order (TRO), which prohibited them from blocking access to the clinics. At no time did the appellants organize en masse sit-ins, lay down in entryways, link hands or chain themselves together, trespass on clinic premises, or make any other attempt to physically blockade clinic property in an effort to deprive women of their constitutional right to choose an abortion. Indeed, the demonstrations generally were orderly and peaceful, a fact Judge Oakes himself acknowledges. See Oakes op. at Background II-A ("The demonstrations are mostly peaceful in nature."); see also Pro-Choice, 799 F.Supp. at 1423. With this more accurate picture of the record in mind, I address the constitutionality of the buffer zone.
 
 
 133
 Paragraph 1(b) of the injunction creates a "First Amendment free zone" around the clinics, banning, as it does, the entire universe of expressive activity within fifteen feet of the clinics, except for the allowance of two sidewalk counselors. The district court provided for the buffer zone in an effort to ensure "unfettered access" to the clinics as well as to "prevent defendants from crowding patients and invading their personal space." Pro-Choice, 799 F.Supp. at 1434.[1] As the original panel determined, this restriction burdens more speech than necessary to accomplish these goals. See Pro-Choice Network v. Schenck, 67 F.3d 359, 370-371 (2d Cir.1994).
 
 
 134
 Significantly, paragraph 1(b) is cumulative. Other portions of the injunction, left intact by the panel majority's opinion, prohibit all obstructionist activities, thereby promoting the aforementioned goals. Specifically, paragraph 1(a) of the injunction, without any buffer zone, prohibits protestors from "trespassing on, sitting in, blocking, impeding, or obstructing access to, ingress into or egress from any facility, including, but not limited to, the parking lots, parking lot entrances, driveways, and driveway entrances, at which abortions are performed." Indeed, in the words of the district court, paragraph 1(a) covers
 
 
 135
 obstructing and impeding access to and egress from the clinics, congregating in private driveways and parking lots, surrounding the cars of patients and staff as they try to enter the driveways and parking lots of the clinics, and crowding, shoving or interfering with patients and staff as they approach the clinic on foot.
 
 
 136
 Pro-Choice, 799 F.Supp. at 1434. Paragraph 1(c), moreover, bars protestors from "physically abusing, grabbing, touching, pushing, shoving, or crowding " any clinic staff member or patient. Id. at 1440 (emphasis added). Finally, paragraph 1(d) enjoins "using any mechanical loudspeaker or sound amplification device or making any excessively loud sound which injures, disturbs, or endangers the health or safety of any patient or employee of a health care facility at which abortions are performed." Id.
 
 
 137
 The inescapable conclusion is that "the [buffer] zone provision ... forbids conduct even beyond that which would obstruct or impede access." Pro-Choice, 67 F.3d at 370. Indeed, within the fifteen-foot buffer zone, the preliminary injunction restricts such sacrosanct First Amendment conduct as holding a placard containing an antiabortion message, passive leafletting or handbilling, silent picketing and even the mere voicing of protest. The Supreme Court, however, consistently has confirmed not only the constitutionally protected status of such activities but their importance in our society. See, e.g., Boos v. Barry, 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988) (stating that law prohibiting display of certain signs "operates at the core of the First Amendment"); Carey v. Brown, 447 U.S. 455, 466-67, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980) ("Public-issue picketing, an exercise of ... basic constitutional rights in their most pristine and classic form, has always rested on the highest rung of the hierarchy of First Amendment values.") (quotation and citation omitted, alteration in original); Organization for a Better Austin v. Keefe, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971) ("This Court has often recognized that the activity of peaceful pamphleteering is a form of communication protected by the First Amendment."). In light of the extensive protection provided to patients by the other provisions of the injunction, the district court had to establish a specific need for the additional blanket prohibitions imposed by the buffer zone. See Madsen, --- U.S. at ----, 114 S.Ct. at 2525 (instructing courts to pay "close attention to the fit between the objectives of an injunction and the restrictions it imposes on speech"); Carroll v. President & Comm'rs of Princess Anne, 393 U.S. 175, 184, 89 S.Ct. 347, 353, 21 L.Ed.2d 325 (1968) (instructing courts to tailor injunctive relief "as precisely as possible to the exact needs of the case"). Here, the record simply does not support such a need.[2]
 
 
 138
 In fact, the district court took great pains to note that the demonstrators had complied with the original TRO, which contained no buffer zone provision around clinic entrances. See Pro-Choice, 799 F.Supp. at 1424 & n. 5. The TRO likewise enjoined the demonstrators from "trespassing on, sitting in, blocking, impeding or obstructing access to, ingress into or egress from any facility ... at which abortions are performed." Id. at 1440. The demonstrators' post-TRO activities generally did not obstruct or impede access to the clinics, thereby providing no justification for the addition of a buffer zone prohibiting otherwise peaceful protest. Absent evidence that the protestors undermined the district court's goal of ensuring access, cf. Madsen, --- U.S. at ---- - ----, 114 S.Ct. at 2527-28 (finding failure of first injunction a factor justifying buffer zone), the addition of paragraph 1(b) clearly burdens more speech than necessary to serve the significant government interests relied on by the district court.
 
 
 139
 In an effort to justify the imposition of the buffer zone the Judge Oakes opinion simply asserts that "despite an initial injunction, protestors continued to impede access to the clinics" and that there was an "extensive record documenting Project Rescue's harassment and intimidation of patients." Oakes op. at Discussion I. Such ambiguous statements, however, hardly prove adequate to assure the " 'precision of regulation' " demanded by Madsen. Madsen, --- U.S. at ----, 114 S.Ct. at 2524 (quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 921, 102 S.Ct. 3409, 3430, 73 L.Ed.2d 1215 (1982)). A thorough study of the record fails to convince me that Judge Oakes' assertions are even justified, given that the pickets were peaceful, there were no threats or acts of violence, and the protestors generally obeyed the TRO. In fact, the bulk of the testimony given at the preliminary injunction hearing pertained to events taking place prior to the district court's granting of the TRO--a factor the district court apparently failed to recognize when establishing the buffer zone.
 
 
 140
 One can only assume, then, that Judge Oakes relies on the five instances of contempt to which he briefly alludes. See Oakes op. at Background, section I.[3] Surprisingly, the opinion fails to analyze these violations of the TRO to support the ultimate finding of the demonstrators' intransigence, even though close examination of the factual basis for such an essential conclusion is the customary practice in First Amendment cases. See, e.g., Claiborne Hardware, 458 U.S. at 915-16 n. 50, 102 S.Ct. at 3420 n. 50 ("We must make an independent examination of the whole record ... so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.") (quotations and citations omitted). Importantly, only two of the five contempt violations stemmed from obstructionist behavior, a point well noted in the original panel majority opinion. See Pro-Choice, 67 F.3d at 370.[4] One was a March 26, 1991 incident involving Reverends Robert and Paul Schenck in which the two men blocked a doorway to a clinic, and the other was a January 1, 1992 incident involving Reverend Paul Schenck and Daren Drzymala, in which they blocked a facility's driveway. In no way do I condone such behavior nor denigrate the two findings of contempt. However, the Supreme Court's First Amendment jurisprudence clearly requires more than two isolated incidents over the course of one and one-half years before a court may banish an entire protest demonstration from a given area. See Claiborne Hardware, 458 U.S. at 915-20, 102 S.Ct. at 3426-29 (discussed infra, Part II).
 
 
 141
 In sum, while deference must be given to the district court's findings, "no constitutional freedom, least of all the guarantees of the Bill of Rights, [may] be defeated by insubstantial findings of fact screening reality." Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 293, 61 S.Ct. 552, 555, 85 L.Ed. 836 (1941). The reality here is that the TRO, with similar provisions to the preliminary injunction's paragraphs 1(a) and (c) and without the over-inclusive buffer zone, effectively secured "unfettered access" to the abortion facilities, thereby making the buffer zone around the clinics more burdensome than necessary under Madsen.
 
 
 142
 Further demonstrating its failure to adhere to the newly enunciated Madsen test, the Oakes opinion factors that appellants "can still picket, carry signs, pray, sing or chant in full view of people going into the clinic or just passing by," Oakes op. at Discussion I, into its analysis. Considerations of whether the injunction leaves open alternative channels of communication is an element under the previously used time, place, and manner test, see Ward, 491 U.S. at 791, 109 S.Ct. at 2753, and is not controlling here. As Madsen made clear, "standard time, place, and manner analysis is not sufficiently rigorous" in evaluating injunctions restricting expressive conduct. Madsen, --- U.S. at ----, 114 S.Ct. at 2525. Indeed, while fifteen feet seems trivial to Judge Oakes, the testimony at the preliminary injunction hearing indicated that with respect to some of the clinics, particularly the one at 1241 Main Street in Buffalo, fifteen feet puts the demonstrators in front of an entirely different building. At other clinics, in more suburban locales, the buffer zone is considerably larger than fifteen feet as a practical matter, unless appellants attempt to protest in the middle of the street. None of appellants' objectives will be served by a demonstration in front of a building other than one housing an abortion clinic nor at the other end of the block on the other side of the street. As our own Judge Mansfield stated, "the effectiveness of any demonstration depends on its proximity to the target and the relevant audience." Concerned Jewish Youth v. McGuire, 621 F.2d 471, 482 (2d Cir.1980) (Mansfield, J., dissenting), cert. denied, 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981). Accordingly, on this record I would uphold the panel's decision to strike the buffer zone as burdening more speech than necessary to achieve the identified goals.
 
 B. The Cease and Desist Provision
 
 143
 I next turn to the cease and desist provision. Judge Oakes today declares that those entering or leaving an abortion clinic comprise a special group of privileged citizens, immune from the rigors imposed by the First Amendment and constitutionally permitted, by virtue of their decision to have an abortion, to muzzle those expressing disagreement with their ultimate choice. In its haste to silence those attempting to dissuade women from terminating their pregnancies, however, the Oakes opinion ignores the First Amendment's "longstanding refusal to [punish speech] because the speech in question may have an adverse emotional impact on the audience." Hustler Magazine v. Falwell, 485 U.S. 46, 55, 108 S.Ct. 876, 881, 99 L.Ed.2d 41 (1988). As Justice O'Connor once noted in another abortion-related case, "it [is] painfully clear that no legal rule or doctrine is safe from ad hoc nullification ... when an occasion for its application arises in a case involving ... abortion." Thornburgh v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 814, 106 S.Ct. 2169, 2206, 90 L.Ed.2d 779 (1986) (O'Connor, J., dissenting). The Oakes opinion's holding with respect to the cease and desist provision proves to be no exception. Once again, we see the abortion ad hoc nullification machine at work.
 
 
 144
 We all agree that Madsen is the appropriate starting point for our analysis. Thus, one would think that Madsen 's treatment of a similar, albeit more restrictive, provision would dictate the outcome here. In Madsen the state court had ordered the demonstrators to refrain from physically approaching any person seeking the services of an abortion clinic " 'unless such person indicates a desire to communicate' in an area within 300 feet of the clinic." Madsen, --- U.S. at ----, 114 S.Ct. at 2529 (quoting injunction). Assessing the provision, the Madsen Court found that it would be difficult to justify enjoining "all uninvited approaches of persons seeking the services of [a] clinic, regardless of how peaceful the contact may be, without burdening more speech than necessary to prevent intimidation and to ensure access to the clinic." Id. at ----, 114 S.Ct. at 2529. Thus, without evidence that the sidewalk counselors' intended communications were "independently proscribable (i.e., 'fighting words' or threats), or [were] so infused with violence as to be indistinguishable from a threat of physical harm," and none was presented, the provision could not stand. Id. (citation omitted).
 
 
 145
 Here, as in Madsen, no evidence was introduced before the district court indicating that the attempts of the sidewalk counselors at communicating with the prospective patients, however emotionally charged those encounters might have been, transcended the bounds of protected speech. The communications were not "independently proscribable," that is, they did not fall into the category of "fighting words"--speech which provokes immediate violence, Chaplinsky v. New Hampshire, 315 U.S. 568, 574, 62 S.Ct. 766, 770, 86 L.Ed. 1031 (1942)--nor could the communications be perceived as so infused with violence as to be indistinguishable from a threat of physical harm. See Milk Wagon Drivers, 312 U.S. at 292-93, 61 S.Ct. at 554-55. Therefore, like the no approach provision in Madsen, see Madsen, --- U.S. at ----, 114 S.Ct. at 2529, the cease and desist provision at issue in this in banc is incompatible with the most basic principle of free expression: "in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide 'adequate "breathing space" to the freedoms protected by the First Amendment.' " Boos, 485 U.S. at 322, 108 S.Ct. at 1164 (quoting Falwell, 485 U.S. at 56, 108 S.Ct. at 882). Accordingly, the original panel majority, like the Court in Madsen, found that the cease and desist provision burdened more speech than necessary to serve the previously identified government interests. See Pro-Choice, 67 F.3d at 371-72.
 
 
 146
 Judge Oakes seeks to avoid the controlling ramifications of Madsen and to justify a total departure from its holding by seizing on any distinction, however insignificant, between the two cases. Thus, he tells us that the cease and desist provision here "is far more solicitous of the demonstrators' right to approach their target audience" than the one examined in Madsen, Oakes op. at Discussion II, as the provision does not completely prohibit sidewalk counselors from initiating conversation with potential counselees. This difference, while real, can hardly serve as the basis for such disparate treatment. Both provisions similarly prove problematic in that they confer on potential counselees the right to control the ability of the sidewalk counselors to engage in otherwise protected expressive speech in a public forum. See Madsen, --- U.S. at ----, 114 S.Ct. at 2529 ("The 'consent' requirement alone invalidates this provision."). Indeed, while the cease and desist provision provides for no express consent requirement, as did the no approach provision in Madsen, it does so sub silentio, and thereby runs afoul of the First Amendment. See Boos, 485 U.S. at 322, 108 S.Ct. at 1164; Street v. New York, 394 U.S. 576, 592, 89 S.Ct. 1354, 1365, 22 L.Ed.2d 572 (1969) ("It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.").
 
 
 147
 Judge Oakes attempts to circumvent this well-entrenched tenet of First Amendment jurisprudence by reliance on the captive audience doctrine. But it is only where an unreceptive audience is truly "captive" that courts will assure the listener protection from offensive speech. The Supreme Court principally has limited application of the captive audience doctrine in the traditional public forum to those cases in which the speaker intrudes on the privacy of the home or its environs, for the "resident is figuratively, and perhaps literally, trapped within the home." Frisby v. Schultz, 487 U.S. 474, 487, 108 S.Ct. 2495, 2504, 101 L.Ed.2d 420 (1988) (upholding ordinance banning picketing outside private residences); see also Florida Bar v. Went For It, Inc., --- U.S. ----, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (upholding ban on lawyer direct-mail solicitations to accident victims and their relatives); Rowan v. United States Post Office Dep't, 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970) (upholding statute that allowed householder to remove name from junk mail lists); Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949) (upholding ban on amplified sound trucks in residential neighborhoods); see generally Eugene Volokh, Freedom of Speech and Workplace Harassment, 39 UCLA L.Rev. 1791, 1832-43 (1992) (arguing captive audience doctrine should not apply to listeners outside their homes). Outside of this context the doctrine has been used sparingly--only when "the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure," Erznoznik v. City of Jacksonville, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975) (emphasis added), i.e., where the audience is physically constrained by its environment. See Lehman v. Shaker Heights, 418 U.S. 298, 307, 94 S.Ct. 2714, 2719, 41 L.Ed.2d 770 (1974) (Douglas, J., concurring) (recognizing riders on public bus to be a captive audience); cf. Young v. New York City Transit Auth., 903 F.2d 146, 158 (2d Cir.) (noting in dicta that passengers riding on subway are akin to a captive audience), cert. denied, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990).
 
 
 148
 It is difficult to see how a person approaching a clinic on a public street or sidewalk can feel a captive of two counselors who are limited to non-threatening speech and are prohibited from "physically abusing, grabbing, touching, pushing, shoving or crowding" the entrant. In fact, in such traditional public fora the Supreme Court consistently has stressed that the conflict between the right of speakers to disseminate their message, however unpleasant, and the desire to protect individuals from hearing it should be resolved in favor of the First Amendment. See, e.g., Erznoznik, 422 U.S. at 212, 95 S.Ct. at 2274 (rejecting captive audience doctrine as basis for upholding ordinance banning the showing of films containing nudity on drive-in movie screens: "The ordinance seeks only to keep these films from being seen from public streets and places where the offended viewer readily can avert his eyes.... Thus, we conclude that the limited privacy interest of persons on public streets cannot justify this censorship of otherwise protected speech on the basis of its content."); Spence v. Washington, 418 U.S. 405, 412, 94 S.Ct. 2727, 2731, 41 L.Ed.2d 842 (1974) (per curiam) (rejecting captive audience doctrine as basis for statute prohibiting improper use of the flag, as "[a]nyone who might have been offended could easily have avoided the display"); Cohen v. California, 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971) (reversing conviction based on display of profanity in public courthouse, as those unsettled by speaker's message "could effectively avoid further bombardment of their sensibilities simply by averting their eyes"); see also International Soc'y for Krishna Consciousness v. Lee, 925 F.2d 576, 586 (2d Cir.1991) (Oakes, C.J., dissenting) (arguing that travelers in airport are not a captive audience as "the Constitution requires those who are offended by the Krishnas to avoid further bombardment ... by averting their eyes") (quotation omitted), aff'd in part on other grounds, 505 U.S. 672, 112 S.Ct. 2709, 120 L.Ed.2d 669 (1992). By holding otherwise, Judge Oakes' opinion today pushes the captive audience doctrine further than any appellate court has ever gone--and to a holding completely unsupported by any precedent in our case law.[5]
 
 
 149
 Significantly, patients approaching the clinics are not powerless to avoid the message of the sidewalk counselors. Those unwilling to accept non-threatening counseling remain free to do so--however insistent the sidewalk counselors may be, the counselee on the public street or sidewalk can escape the unwanted message simply by continuing to walk towards and entering the clinic. Cf. Lehman, 418 U.S. at 307, 94 S.Ct. at 2719 (Douglas, J., concurring) ("One who hears disquieting or unpleasant programs in public places ... can get up and leave. But the man on the streetcar has no choice but to sit and listen.") (quotation omitted). As long as the injunction ensures access to the clinics, which it clearly does, the right to refuse sidewalk counseling remains secure. Moreover, patients are not forced or compelled to read any of the literature distributed to them outside the clinics. See Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 78, 103 S.Ct. 2875, 2886, 77 L.Ed.2d 469 (1983) (Rehnquist, J., concurring) ("the recipient ... 'may escape exposure to objectionable material simply by transferring [it] from envelope to wastebasket' ") (quoting Consolidated Edison Co. v. Public Serv. Comm'n of N.Y., 447 U.S. 530, 542, 100 S.Ct. 2326, 2336, 65 L.Ed.2d 319 (1980)) (alteration in original). While counselors may cause distress to those attempting to enter the clinics, such offense is an inevitable cost of free expression under the First Amendment. "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949). This may be small comfort to those confronted with sidewalk counseling but, as Justice Brennan once wrote, "that minor inconvenience is a small price to pay for the continued preservation of so precious a liberty as free speech." Lehman, 418 U.S. at 320-21, 94 S.Ct. at 2726 (Brennan, J., dissenting).
 
 
 150
 Indeed, the patient here is about to choose a course of conduct that is final and irreversible--the termination of the life of a fetus. The choice is a difficult one, perhaps made more so because the information conveyed by the sidewalk counselors may cause the patient to question the wisdom or morality of the earlier decision to terminate the pregnancy. This fact, however, is no reason to give the message less protection than we accord other unwelcome speech, see, e.g., Olivieri v. Ward, 801 F.2d 602, 606-08 (2d Cir.1986) (permitting homosexual group and counter-demonstrators to protest outside St. Patrick's Cathedral), cert. denied, 480 U.S. 917, 107 S.Ct. 1371, 1372, 94 L.Ed.2d 687 (1987), commercial speech, see, e.g., New York State Ass'n of Realtors v. Shaffer, 27 F.3d 834, 844 (2d Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 511, 130 L.Ed.2d 418 (1994), and even pornography. See, e.g., Carlin Communications v. FCC, 749 F.2d 113, 121-23 (2d Cir.1984) (invalidating regulations on telephone "dial-a-porn" services). It is a sad day for the First Amendment when a message intended to inform women of the consequences of undergoing an abortion occupies a lower rung of protection than that enjoyed by a commercial message on a billboard, see National Advertising Co. v. Town of Babylon, 900 F.2d 551, 556-57 (2d Cir.), cert. denied, 498 U.S. 852, 111 S.Ct. 146, 112 L.Ed.2d 112 (1990), or sexually explicit literature. See 754 Orange Ave. Inc. v. City of West Haven, 761 F.2d 105, 111-13 (2d Cir.1985).
 
 
 151
 Judge Oakes additionally attempts to justify this gagging of the protestors by asserting that the provision provides "a vulnerable group of medical patients with some relief from the duress caused by unwelcome physical proximity to an extremely vocal group of demonstrators." Oakes op. at Discussion II. If it is only "unwelcome physical proximity" that needs to be prevented, however, then surely there are ways to do so short of banishing the entire practice of sidewalk counseling at the command of the counselee. See Claiborne Hardware, 458 U.S. at 916, 102 S.Ct. at 3427 (demanding "precision of regulation" in injunctions prohibiting constitutionally protected activity) (quotation omitted).[6] But to say that sidewalk counseling may be regulated is not to say that it may be prohibited in its entirety, certainly not at the will of those who dislike the message. See Bolger, 463 U.S. at 71, 103 S.Ct. at 2883 ("[W]e have consistently held that the fact that protected speech may be offensive to some does not justify its suppression.") (quoting Carey v. Population Servs. Int'l, 431 U.S. 678, 701, 97 S.Ct. 2010, 2024, 52 L.Ed.2d 675 (1977)). Indeed, even amicus American Civil Liberties Union, which generally supports appellees' position on the injunction, views the cease and desist provision as too restrictive in this respect.
 
 
 152
 Further, Judge Oakes' reasoning leads me to question the content (and viewpoint) neutrality of the cease and desist provision.[7] He claims that it is the demonstrators' physical proximity that is regulated rather than their message, thus making the provision content and viewpoint neutral. Testimony largely ignored by the opinion, however, indicates that another "extremely vocal group," the group of patient escorts, is allowed to get physically close to this "vulnerable group of medical patients," often even closer than the sidewalk counselors themselves. As the district court noted,
 
 
 153
 [T]he patient escorts also become frustrated and angry by the persistence of the "sidewalk counselors." The patient escorts often respond by raising their voices in order to drown out the "counselors' " message, and attempt to block and impede the "sidewalk counselors" from following the patients.... [T]he evidence adduced at the hearings clearly shows that their behavior often serves only to exacerbate an already difficult situation.
 
 
 154
 Pro-Choice Network, 799 F.Supp. at 1425 n. 6. If the cease and desist provision truly was aimed at extremely vocal groups who come within "unwelcome physical proximity" to clinic patients, then the escorts no doubt should be included in the injunction's coverage. That they are not, see Oakes op. at n. 5, leads to an inescapable conclusion: Judge Oakes' term "unwelcome" does not refer to the physical proximity of the demonstrators, but to their message. Such censorship is entirely impermissible under the First Amendment. See Forsyth County v. Nationalist Movement, 505 U.S. 123, 134, 112 S.Ct. 2395, 2403, 120 L.Ed.2d 101 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation."); R.A.V. v. City of St. Paul, 505 U.S. 377, 381-82, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992) ("The First Amendment generally prevents government from proscribing speech ... because of disapproval of the ideas expressed."); Boos, 485 U.S. at 321, 108 S.Ct. at 1163. I need not dwell on this point for long, as even under the less than strict scrutiny test for content-neutral restrictions on speech, the "cease and desist" provision fails to pass constitutional muster.
 
 
 155
 I would uphold the panel's decision to strike the cease and desist provision as burdening more speech than necessary to achieve the significant interests identified by the district court.
 
 II
 
 156
 Judge Winter's concurring opinion reiterates the unassailable principle that "the First Amendment does not, in any context, protect coercive or obstructionist conduct that intimidates or physically prevents individuals from going about ordinary affairs." See, e.g., Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) ("Of course, where demonstrations turn violent, they lose their protected quality as expression under the First Amendment.") (footnote omitted); Milk Wagon Drivers, 312 U.S. at 298, 61 S.Ct. at 557 (holding an injunction banning picketing was "justified only by the violence that induced it and only so long as it counteracts a continuing intimidation"). Where attempts to persuade others through the application of force rather than persuasion by reason occur, of course courts should not hesitate to sanction and enjoin such conduct. Indeed, on this ground the original panel majority affirmed the issuance of the preliminary injunction in the first instance and upheld those portions of the injunction restraining the protestors from engaging in violent, unduly coercive or obstructionist behavior. See, e.g., Preliminary Injunction, p 1(a) (barring trespassing, blocking or impeding access to clinics); p 1(c) (enjoining "physically abusing, grabbing, touching, pushing, shoving, or crowding" of clinic patients or staff); p 1(d) (prohibiting "making any excessively loud sound which injures, disturbs, or endangers the health or safety of any patient or employee").
 
 
 157
 Where Judge Winter and I part company is in his apparent belief that we may uphold an injunction that sweepingly denies appellants their constitutional right to express their views peaceably without an extensive record documenting coercive, obstructionist or violent conduct. As I read the relevant Supreme Court case law, before an injunction banning both protected and non-protected demonstrative activity may be justified there first must be a showing that such coercive behavior is pervasive, "color[ing] the entire collective effort," Claiborne Hardware, 458 U.S. at 933, 102 S.Ct. at 3436, thereby leading to the conclusion that the offending aspects of a demonstration cannot be separately and less intrusively controlled by any means other than eliminating all peaceful forms of protest. See, e.g., Milk Wagon Drivers, 312 U.S. at 294-96, 61 S.Ct. at 555-56 (upholding injunction on peaceful picketing "to prevent future coercion" because the protesting "was set in a background of violence" which was "neither episodic nor isolated"). This is the very essence of Madsen 's "burdens no more speech than necessary" test. See Madsen, --- U.S. at ----, 114 S.Ct. at 2526 ("We think a standard requiring that an injunction 'burden no more speech than necessary' exemplifies 'precision of regulation.' ") (footnote omitted) (quoting Claiborne Hardware, 458 U.S. at 916, 102 S.Ct. at 3427). Indeed, if Madsen 's "burdens no more speech than necessary" requirement may be satisfied merely by pointing to a few isolated instances of coercive or obstructionist behavior in a protest, it is not much of a requirement at all.
 
 
 158
 Perhaps no case better illustrates this point than Claiborne Hardware. Claiborne Hardware also involved protest demonstrations where protected forms of expression were intermixed with unduly coercive activity, far more coercive than that encountered in our case. The protests at issue there centered around a boycott of white-owned businesses by a group of Blacks seeking racial equality and integration. During the boycott "sporadic acts of violence ensued." 458 U.S. at 902, 102 S.Ct. at 3420. For instance Charles Evers, the leader of the boycott, told a group that "boycott violators would be 'disciplined' by their own people and warned that the Sheriff could not sleep with boycott violators at night." Id. Evers further stated: " 'If we catch any of you going in any of them racist stores, we're gonna break your damn neck.' " Id. (footnote omitted). In support of the boycott peaceful and orderly pickets were organized outside of white-owned stores. Further, "store watchers" were posted outside of the boycotted stores to identify those who did business with the merchants. Id. at 903, 102 S.Ct. at 3420. The names of these violators were read at meetings of the local NAACP chapter and published in a local Black newspaper. These boycott violators "were branded as traitors to the black cause, called demeaning names, and socially ostracized for merely trading with whites." Id. at 904, 102 S.Ct. at 3421 (quotation omitted). Some, moreover, had shots fired at their houses, bricks thrown through their windshields and had their property damaged.
 
 
 159
 In response the trial court issued a broad permanent injunction. The order enjoined the protestors from stationing the "store watchers" at white-owned businesses; from "persuading" anyone from breaking the boycott; from "using demeaning and obscene language to or about any person" who continued to trade with white-owned businesses; from picketing outside the white-owned businesses; and from employing any violence against any person or causing damage to any property. Id. at 893, 102 S.Ct. at 3415. Despite the evidence of acts of violence and intimidation the Supreme Court nonetheless set aside the injunction. The Court stated that isolated acts of non-First Amendment protected activity could not justify a complete prohibition on all protected forms of expression. Indeed, the Claiborne Hardware Court went on to say:
 
 
 160
 A massive and prolonged effort to change the social, political, and economic structure of a local environment cannot be characterized as a violent conspiracy simply by reference to the ephemeral consequences of relatively few violent acts. Such a characterization must be supported by findings that adequately disclose the evidentiary basis for concluding that specific parties agreed to use unlawful means, that carefully identify the impact of such unlawful conduct, and that recognize the importance of avoiding the imposition of punishment for constitutionally protected activity. The burden of demonstrating that fear rather than protected conduct was the dominant force in the movement is heavy. A court must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless free-standing trees.
 
 
 161
 Id. at 933-34, 102 S.Ct. at 3436.
 
 
 162
 I fear that Judge Winter's concurring opinion looks to the proverbial reptiles of this protest to justify the blanket ban on expression imposed by both the buffer zone and cease and desist provisions. Because I believe that appellees have failed to satisfy their "heavy" burden of demonstrating that the instances of coercion and otherwise unprotected conduct were so pervasive as to color the entire demonstrations, I remain firm in my belief that these provisions unconstitutionally restrict appellants' First Amendment rights.
 
 III
 
 163
 I am confident that the members of our Court will soon come to regret the damage wrought to our First Amendment jurisprudence. Under either rationale offered for today's result the Court effectively reduces Madsen 's "burdens no more speech than necessary" test to a mere cliche.
 
 
 164
 I dissent.
 
 ALTIMARI, Circuit Judge, dissenting:
 
 165
 I am saddened by our holding today. Because I believe that the majority of the Court has departed from a proud tradition of zealously protecting the most fundamental of the freedoms bequeathed to us by our forefathers--the right to speak freely, on a sidewalk or street corner--I respectfully dissent. Unlike the challenged injunction, which I agreed in the original majority opinion was content neutral, I believe that Judge Oakes's decision is content based. Were abortion not the issue, our original disposition would have occasioned little interest and no notoriety. I write separately only to add a few thoughts to the fine dissenting opinion of Judge Meskill, in which I concur.
 
 
 166
 In Madsen v. Women's Health Center, Inc., --- U.S. ----, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), the Supreme Court articulated a new test to be applied to content-neutral injunctions. The original panel opinion did nothing more than apply the new standard to the injunction issued by the district court. We concluded that two of the several challenged provisions burdened more speech than necessary and thus violated the rule established in Madsen. Having searched thoroughly the record, I am at peace with our initial conclusion. Despite the preferred status that has been conferred upon pure speech as exercised in traditional public fora, both majorities today disregard their solemn duties to jealously guard that speech.
 
 
 167
 The "floating bubble zone" established by the district court, and now reaffirmed by the Court, is an unprecedented and unwarranted incursion on freedom of speech. In Madsen, reviewing a factual record that revealed far more intransigence than was present here, the Court upheld a 36 foot buffer zone to "protect[ ] unfettered ingress to and egress from the clinic," --- U.S. at ----, 114 S.Ct. at 2527, and to ensure that the protesters did not block traffic on the narrow street that afforded vehicular access to the clinic parking lot. The bubble zone was justified by two conditions: (1) protesters whose zeal and belligerence demanded some sort of buffer zone; and (2) a physical setting that left the state court with "few other options to protect access" to the clinic. Id. As is clear from the original majority opinion, neither of these circumstances obtains here.
 
 
 168
 Had the protesters in question today in fact infringed the rights of the women seeking access to the clinic, I would be the first to uphold restraints against them. I remain persuaded, however, that the protesters tread only upon the sidewalks and streets--a protected setting for the free exercise of persuasive speech--and not upon the constitutional rights of those individuals seeking access to the clinics. Without reciting a record already familiar to the reader, I shall say only that I am perplexed by the Court's apparent disregard of the district court's commendation of Project Rescue's compliance with the TRO, see Pro-Choice Network of Western New York v. Project Rescue Western New York, 799 F.Supp. 1417, 1424 n. 5 (W.D.N.Y.1992), a finding that speaks volumes to the lack of necessity for this overreaching injunction. Further, it is undisputed that the unusually restrictive physical setting of the Madsen clinic is not duplicated here. It is clear that here, where most of the injunction was upheld, see, e.g., Injunction p 1(c) (precluding crowding); see also Pro-Choice Network v. Schenck, 67 F.3d at 372-374 (2d Cir.1994), any bubble zone is more burdensome than necessary, much less one which amorphously wafts along immuring any individual coming or going from the clinic. The insidious nature of the bubble is apparent when one considers that it is (1) invisible: a protester may not know that a person has stepped inside a bubble; and (2) chillingly ill-defined: not only does the injunction fail to identify the distance a bubble may travel, but, even if the distance were somehow divined by the district court, a protester has no way of ascertaining that information.
 
 
 169
 The Court's treatment of the "cease and desist" provision is even more disquieting. As the Supreme Court has instructed, in certain "traditional settings ... First Amendment values inalterably prevail." Lehman v. City of Shaker Heights, 418 U.S. 298, 302, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974). In this case, the restrained speech occurred on streets and sidewalks outside health facilities. Yet the Court today chooses to disregard the very foundation upon which our First Amendment freedoms are built. It is axiomatic that "all public streets are held in the public trust and are properly considered traditional public fora." Frisby v. Schultz, 487 U.S. 474, 481, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988). Accord Madsen, --- U.S. at ----, 114 S.Ct. at 2522 (public sidewalks are public fora); Lehman, 418 U.S. at 303, 94 S.Ct. at 2717 (traditional public fora include open spaces, meeting halls, parks, and street corners). And, as perhaps we all need reminding,
 
 
 170
 a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.
 
 
 171
 Terminiello v. City of Chicago, 337 U.S. 1, 4-5, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949) (citations omitted).
 
 
 172
 Resort by the Court to the "captive audience" cases as an effort to evade these bedrock principles rings hollow. The teaching of the captive audience cases is that speech aimed at citizens who are in a place " 'as a matter of necessity, not of choice,' " Lehman, 418 U.S. at 303, 94 S.Ct. at 2717 (quotation omitted), may be entitled to less protection than speech aimed at citizens who could freely exercise the option to go elsewhere. See, e.g., Frisby, 487 U.S. at 484-85, 108 S.Ct. at 2502-03; Lehman, 418 U.S. at 302-03, 94 S.Ct. at 2716-17 (captive audience on public transportation); Young v. New York City Transit Authority, 903 F.2d at 158 (same). The character of the street--abutting a medical facility--"may well inform the application of the relevant test, but it does not lead to a different test; the [disputed restriction] must be judged against the stringent standards [the Supreme Court has] established for restrictions on speech in traditional public fora...." Frisby, 487 U.S. at 481, 108 S.Ct. at 2500. Moreover, as the Supreme Court directed in Madsen, we are to apply an even more stringent test than the familiar time, place and manner analysis where injunctive relief is concerned. The Court today flouts that instruction.
 
 
 173
 I do not dispute that people seeking access to clinics may be, in some sense of the word, "captives." That label, however, suggests only that the state consequently has a legitimate interest in sheltering their physical and psychological well-being. I have no objection to that laudable goal. It is with respect to how that objective is accomplished that I part ways with my colleagues. To my mind, it cannot be said that a prohibition on signs within fifteen feet of an unwilling listener "burden[s] no more speech than necessary." Nor, I think, can it be said that vesting unwilling listeners--even those "en route to a destination,"--with the absolute power to banish speech to a distance of fifteen feet from a moving target burdens no more speech than necessary. The Court's ability to construe these provisions such that they pass constitutional muster puts me in mind of Lewis Carroll's classic passage:
 
 
 174
 "When I use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean--neither more nor less."
 
 
 175
 "The question is," said Alice, "whether you can make words means so many different things."
 
 
 176
 "The question is," said Humpty Dumpty, "which is to be master--that's all."
 
 
 177
 Alice Through the Looking Glass, Lewis Carroll (1872).
 
 
 178
 The district court properly found the facts. The Supreme Court gave us the law. And the original majority faithfully applied it, without regard for the subject of the dispute that occasioned issuance of the injunction. The new majorities, however, have sacrificed not only our proper role--to remand a concededly flawed injunction for correction by the district court--but also, in the bargain, the "preferred position" of the First Amendment, see Beauharnais v. Illinois, 343 U.S. 250, 285, 72 S.Ct. 725, 745, 96 L.Ed. 919 (1952) (Black, J., dissenting). The question now is "which is to be master--that's all."
 
 As a result, we have compromised
 
 179
 [t]he free trade in ideas which the Framers of the Constitution visualized.... In its place there is substituted a new orthodoxy--an orthodoxy that changes with the whims of the age or the day, an orthodoxy which the majority by solemn judgment proclaims to be essential to the safety, welfare, security, morality, or health of society. Free speech in the constitutional sense disappears. Limits are drawn--limits dictated by expediency, political opinion, prejudices or some other desideratum of legislative action.
 
 
 180
 Id.
 
 
 181
 Like Alice, I am befuddled by the whimsy effected today. I dissent.
 
 
 
 [1]
 The TRO stated in pertinent part:
 ORDERED that Defendants ... are:
 
 
 [1]
 Temporarily enjoined and restrained in any manner or by any means from:
 (a) trespassing on, sitting in, blocking, impeding or obstructing access to, ingress into or egress from any facility at which abortions are performed in the Western District of New York, including demonstrating within 15 feet of any person seeking access to or leaving such facilities, except that sidewalk counseling by no more than two persons as specified in paragraph (b) shall be allowed;
 (b) physically abusing or tortiously harassing persons entering or leaving, working at or using any services at any facility at which abortions are performed; Provided, however, that sidewalk counseling, consisting of a conversation of a nonthreatening nature by not more than two people with each person they are seeking to counsel shall not be prohibited. Also provided that no one is required to accept or listen to sidewalk counseling and that if anyone who wants to, or who is sought to be counseled who wants to not have counseling, wants to leave, or walk away, they shall have the absolute right to do that, and in such event the persons seeking to counsel that person shall cease and desist from such counseling of that person.
 (c) making any excessively loud sound which disturbs, injures, or endangers the health or safety of any patient or employee of a health care facility where abortions are performed in the Western District of New York, nor shall any person make such sounds which interferes [sic] with the rights of anyone not in violation of this Order;
 (d) attempting, or inducing, encouraging, directing, aiding, or abetting in any manner, others to take any of the actions described in paragraphs (a), (b) and (c) above.
 
 
 [2]
 This opinion appeared in the advance sheet at 34 F.3d 130-147, but was withdrawn from the bound volume pending a rehearing in banc poll
 
 
 [3]
 The issues we address in this rehearing arise solely from the appeal of the district court's Pro-Choice I decision. Thus, we consider only the facts that were before the district court at that time and do not consider the evidence that was before the court in Pro-Choice II regarding the "Spring of Life" protests which took place after the injunction was issued
 
 
 [4]
 We do not address the issue, raised by Project Rescue at oral argument, of how far from a clinic a floating buffer zone may reach to protect a person "seeking access to or leaving" the clinic. This is exactly the type of issue that is best left to case-by-case adjudication by the district court. We are confident that the district court will apply a reasonable geographic scope to the phrase "seeking access to or leaving."
 
 
 [5]
 In thus interpreting the "cease and desist" provision, we do not decide all the issues raised by Project Rescue. We do not decide, for one, whether a "counselor" could be forbidden from coming within 15 feet of a person who has rebuffed his or her advances, in order to "counsel" another person who has not rebuffed the "counselor." Appellees conceded at oral argument that the injunction as written does not bar this. See tr. of oral argument, at 21-22. Nothing in the record suggests that such a scenario has occurred. If the issue arises, it may, of course, be addressed by the district court
 Also addressable by the district court, on appropriate application, is Project Rescue's contention that its "counselors" cannot be heard because the patient escorts drown out their message. Project Rescue may, of course, apply to the district court for a modification of the injunction on the basis of this or any other circumstances which arise.
 
 
 [6]
 The injunction that this court upheld in Terry was similar in some, but by no means all, respects to the Pro-Choice injunction. See Terry, 886 F.2d at 1345 n. 1. For instance, it contained provisions similar to those in paragraphs 1(a) and 1(c) of the Pro-Choice injunction, restraining Operation Rescue from blocking access to clinics or harassing women as they entered, and allowing "sidewalk counseling." It did not, however, create a buffer zone, and its "walk away" provision lacked the "cease and desist" language of the Pro-Choice injunction as well as the requirement that rebuffed "counselors" retreat to a distance of fifteen feet from their failed targets. See id
 
 
 [1]
 I do not agree with the panel's view that, because the protestors generally (but not entirely) complied with the restraining order, a more specific buffer zone and cease and desist provision could not be imposed by the preliminary injunction. The bullying and planned blockade did not disappear from the record because most of the protestors were on good behavior while the preliminary injunction was under consideration. In my view, the district court had ample discretion to impose specific restraints in the preliminary injunction to insure that such conduct was not renewed
 
 
 [1]
 The Oakes opinion asserts that the safe performance of abortions was also a goal of the district court in effectuating the buffer zone. The district court, however, never gave this as a stated reason. See Pro-Choice, 799 F.Supp. at 1434. Moreover, Judge Oakes offers no explanation whatsoever as to the correlation between the creation of fifteen foot bubble zones around the clinics and the safe performance of abortions in the clinics
 
 
 [2]
 The Oakes opinion, quoting the district court with approval, states that appellants' "noisy, disruptive, invasive, threatening and intimidating activities are clearly inappropriate in [this] setting." Oakes op. at Discussion I (quoting Pro-Choice, 799 F.Supp. at 1434). While perhaps not obvious from the opinion, these demonstrations did not occur within the health care facilities, they took place on the public sidewalks of the Western District of New York. On public sidewalks, the quintessential public forum, see United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736 (1983), "expressive activity will rarely be incompatible with the intended use of the property, as is evident from the facts that they are 'natural and proper places for dissemination of information and opinion,' Schneider v. State, 308 U.S. 147, 163 [60 S.Ct. 146, 151, 84 L.Ed. 155] (1939), and from 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' Hague v. CIO, 307 U.S. [496,] 515 [59 S.Ct. 954, 964, 83 L.Ed. 1423] [ (1939) ]." Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 817, 105 S.Ct. 3439, 3457, 87 L.Ed.2d 567 (1985) (Blackmun, J., dissenting)
 
 
 [3]
 While Judge Oakes correctly notes that there were six civil contempt motions filed, there were only five contempt judgments entered. The district court found that Pro-Choice had failed to meet its burden of proving one of the incidents alleged. See Pro-Choice Network v. Walker, 994 F.2d 989, 993 (2d Cir.1993)
 
 
 [4]
 The other incidents involved the contemnors' failure to observe the TRO's "cease and desist" provision, a provision whose fatal defects I discuss below
 
 
 [5]
 The Oakes opinion's selective quoting from Madsen notwithstanding, that case cannot be read as support for the use here of the "captive audience" doctrine. The Madsen Court simply recognized that women in the clinic were "held 'captive' by medical circumstance," Madsen, --- U.S. at ----, 114 S.Ct. at 2526, thus supporting some of the injunction's restrictions, for example, those on banning loud noise levels or prohibiting the use of sound amplification equipment. This, however, does not mean that the women approaching the clinic are captive, and nothing in Madsen can be read as so holding
 
 
 [6]
 Ironically, by forcing the counselors to withdraw fifteen feet and to "continue advocating his or her beliefs to the woman who has refused them" from that distance, Oakes op. at Discussion II, the injunction as modified by the Oakes opinion forces those who wish to exercise their First Amendment rights to resort to raising their voices, which inevitably leads to a more hostile environment--something to be avoided
 
 
 [7]
 I note that the Madsen Court left open the question of whether the no approach provision was content-based. See Madsen, --- U.S. at n. 6, 114 S.Ct. at 2529 n. 6